262

THE STATE OF OHIO, APPELLEE, *v.* BLACK, APPELLANT.

(No. 76-219—Decided December 22, 1976.)

*Mr. William F. McKee,* prosecuting attorney, and *Mr. William J. Brown,* attorney general, for appellee.

, *Frizzell & Hendricks Co., L. P. A., Mr. Kenneth G. Frizzell, Messrs. Mills, Nelson & Remy* and *Mr. Reese F. Mills,* for appellant.

PAUL W. BROWN, J.   Appellant's claim that Ohio's death penalty is cruel and unusual punishment under *Furman, supra,* and under the specified provisions of the federal and state Constitutions, has been decided by this court in *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, and the appellant's claim is overruled for the reasons therein stated.

We have examined the record  and carefully considered the appellant's claim with regard to his self-incriminatory statements given during intermittent in-custodial police interrogation during a period beginning February 11, 1974, at 10:24 a. m. and ending February 13, 1974, at 7:10 p. m., while the appellant was confined for an unrelated crime (possession of marijuana).

Appellant claims that by persistent interrogation at that time, he was coerced by police conduct in proceeding to question him after he had refused to sign a written waiver of his *Miranda* constitutional rights (*Miranda* v. *Arizona* [1966], 384 U. S. 436), and after he had on two occasions specifically requested the opportunity to call his attorney.

We have carefully reviewed the record as did also the Court of Appeals and find that the appellant's claims in this regard are groundless. Quite clearly during this entire period, the confinement was treated by the police as an opportunity to focus upon the appellant an ongoing inquiry designed to identify the person or persons responsible for two separate murder-robberies which had occurred in Richland County on January 21, 1974.

On an earlier date, January 22, 1974, appellant had been arrested as the result of a "stake-out" of a red Mercury Cougar automobile owned by his girlfriend and tied to each of the homicides by statements of witnesses at the murder scenes as well as by an anonymous phone

call to the police suggesting both its use by appellant and his complicity in the crimes. At that time appellant voluntarily took a lie-detector test and was released.

The questioning, which took place during the stated period and which resulted in his self-incriminating statements directly confirming appellant's responsibility for one of the homicides under investigation and his complicity in the other, was intermittent. It began shortly after appellant's arrest on February 11, 1974, at which time he was read his *Miranda* rights. It stopped very shortly thereafter when appellant asked for an opportunity to use the phone to call his lawyer, which request was promptly granted. We conclude from the record, and particularly from that part of the record which covers the hearing upon appellant's pretrial motion to suppress his statements containing testimony of appellant and of the numerous police officers involved in the questioning or present when it occurred, that appellant neither before nor after this phone call made more than a request for permission to call his counsel. He did not indicate a desire not to be questioned unless his counsel could be present. He made no request that counsel be appointed. His conduct and his responses to questioning throughout the period demonstrated his belief that he was represented by counsel and his confidence that he knew his rights and was in control of the situation.

At each resumption of questioning, his rights were again read from a statement which was then initialed by him. Questioning then continued until appellant indicated that he wanted it to stop. The record shows that appellant called a halt upon several such occasions conditioning his further answers upon his being given the opportunity to talk to his girlfriend, his father, his sister, a minister, and one Eatmon, his alleged accomplice.

On each occasion his request was granted, his rights were again read, and, upon resumption of questioning, further disclosures were made by the appellant.

Not only were the directions of *Miranda* scrupulous-

ly observed, but also care was taken so that it can not be said that it was an "incommunicado interrogation" of one alone and deprived of outside support, so as to effectively undermine his will to resist confidently-made suggestions of his guilt. Defendant's rights were fully honored. Under such conditions, as stated in *Wan* v. *United States* (1924), 266 U. S. 1, 14, and quoted with approval in *Miranda, supra,* at page 462, "* * * [a] confession may have been given voluntarily although it was made to police officers, while in custody, and in answer to an examination conducted by them." Unlike *Escobedo* v. *Illinois* (1964), 378 U. S. 478, the confession here resulted from the defendant's independent decision to speak after being confronted at his own request by those of his friends and associates who were aware of his involvement in the crimes and by his father whom he possibly wished to warn of his impending confession and to whom he asserted that the homicide was accidental rather than purposeful. The statements made to him by Eatmon that he was going to "tell the truth" triggered his decision to speak rather than inquisitorial proceedings. The circumstances show no "over-zealous police" (see *Brown* v. *Walker* [1896], 161 U. S. 591), no hostile atmosphere. The statements which resulted merely confirmed persuasive and compelling evidence of guilt.

In-custodial interrogation properly and fairly conducted fills a law-enforcement need. Where the *Miranda* warnings are given and their meaning honored, trial courts should be permitted to review circumstances of the interrogation so as to assure the reliability of the evidentiary result, arrive at a decision as to voluntariness of the statements in question and make necessary rulings as to admissibility without fear of reversal based upon presumptions of coerciveness or non-waiver arising out of extensions of *Miranda* or *Escobedo, supra,* beyond the facts of those particular cases. See *Michigan* v. *Tucker* (1974), 417 U. S. 433; *Johnson* v. *New Jersey* (1966), 384 U. S. 719, 733-34; *Kirby* v. *Illinois* (1972), 406 U. S. 682, 689; *Frazier* v. *Cupp* (1969), 394 U. S. 731, 739.

Appellant testified that late in the interrogation, after his confession, but prior to giving a written statement, he again asked for permission to call his counsel and that his request was on that occasion not granted. Police say this may have occurred. We consider that this admission does not affect our finding that the procedures followed were not such as were proscribed by *Miranda* or *Escobedo,* nor destructive of the trial court's conclusion on the question of voluntariness of the confessions, the latter of which, although coming thereafter, seems but an apparent effort by the appellant to involve Eatmon in the second homicide so as to impair his credibility as a witness against the appellant.

We find no validity to appellant's claim that his repeated refusal to sign a written waiver of his rights required police to discontinue interrogatories. Such rights need not be waived in writing if they are effectively and intelligently waived by the independent decision of the defendant to speak voluntarily and without coercion, actual or presumed.

Appellant asserts that he was denied the effective assistance of counsel. The Court of Appeals carefully analyzed this claim, and after examination of its factual basis, concluded that it was unfounded. Upon re-examination, we agree in all particulars with that court's ruling on the matter, and overrule this proposition of law.

Appellant's claim that the sentencing statutes are vague or ambiguous so that they fail to provide the sentencing judge with standards upon which to base his decision at the mitigation hearing, turns upon his claim that the terms "psychosis" and "mental deficiency" contained therein are not defined. The portion of R. C. 2929.04, with which we are concerned, follows:

"(B) Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offense and the history, character, and con-

dition of the offender, one or more of the following is established by a prepondence [sic] of the evidence.

" * * *

" (3) The offense was primarily the product of the offender's *psychosis* or *mental deficiency*, though such condition is insufficient to establish the defense of insanity." (Emphasis added.)

It is clear that the General Assembly chose the emphasized language to allow the trial judge or panel the broadest possible latitude in the examination of the defendant's mental state and mental capacity for the purpose of the mitigation inquiry, excepting only legal insanity, the existence of which would have absolved the defendant from criminal responsibility for his crime. Thus, broadly defined and however evidenced, any mental state or incapacity may be considered in light of all the circumstances and including the nature of the crime itself so that it may be determined whether the condition found to have existed was the primary producing cause of the offense. To define terms such as those used in the statute is to narrow them.

It has often been charged that our definition of legal insanity is too narrowly defined. For the appellant to claim that the mental state for purposes of the mitigation hearing also needs to be so defined, is to bind the conscience of the trial court initially, and of the appellate court and this court on review. The language used has a saving grace, for it will permit the examination of the mental state of the offender, whether juvenile, adolescent or adult, in light of the offense, the offender, and all of the circumstances of the crime, for the purpose of reaching a decision on humane grounds as to whether society needs to exact the ultimate penalty.

It is appellant's final claim that the trial court improperly conducted the mitigation hearing required by R. C. 2929.03(D) and (E). Two principal grounds are argued for this contention. Firstly, appellant argues that the judge did not conduct the examination of the witnesses in that

hearing or lead in their questioning; and secondly, that the pre-sentence investigation and psychiatric examination required by R. C. 2947.06 was performed by one who was unable, upon questioning by the defendant's counsel, to state whether the offense here considered was primarily the product of such mental deficiency as he found to exist.

R. C. 2929.03(D) and (E) do not require the court or panel in conducting the hearing to conduct the examination by asking questions, although quite clearly the hearing is designed to assist the trial judge or the panel so as to be able to impose or mitigate the statutory penalty.

Nor does R. C. 2947.06 require that the psychiatrists prepare to give opinions as to whether the mental state or condition found to exist primarily cause the offense. That question is for the court or the panel which has heard the case after the mitigation hearing.

Under R. C. 2947.06, the psychologists or psychiatrists who may be appointed to examine the defendant are to "make such reports concerning the defendant as the court requires for the purpose of determining the disposition of the case."

That disposition may be made without anyone asking the expert his opinion upon the ultimate question.

We conclude that the disposition of this cause is consistent with and required by the evidence; that no error prejudicial to the appellant has occurred and that the sentence, having been lawfully imposed, should be carried out.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT and CORRIGAN, JJ., concur.

STERN, CELEBREZZE and W. BROWN, JJ., concur in paragraph four of the syllabus and in the judgment.