224

The State of Ohio, Appellee, *v.* Weind, Appellant.

(No. 76-1128—Decided June 22, 1977.)

*Mr. George C. Smith,* prosecuting attorney, and *Mr. Ronald J. O'Brien,* for appellee.

*Messrs. Metz, Bailey & Norris* and *Mr. Kenneth J. Spicer,* for appellant.

## I A.

*Per Curiam.* Appellant's first five propositions of law attack the constitutionality of Ohio's death penalty statutes.

In his first proposition of law, appellant contends that the Ohio statutory scheme places unconstitutional limitations upon the consideration of mitigating circumstances, since the character and history of the defendant do not constitute separate mitigating circumstances, but are considered only in terms of establishing duress, coercion, strong provocation, psychosis, or mental deficiency, all of which focus the trial judge's attention on the defendant's condition or state of mind at the time of the offense.

In *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 86, this court, finding that Ohio's mitigating factors were "basically reasonable and similar" to those approved in *Proffitt* v. *Florida,* 428 U. S. 242, 49 L. Ed. 2d 913, upheld the constitu-

tionality of Ohio's scheme for establishing mitigating cir- cumstances, and further discussion on this issue is not mer- ited.

## IB.

In his second proposition of law, appellant claims that the Ohio death penalty statutes are unconstitutional in that one accused of a capital offense is denied the right to a judgment of his peers as to the existence of mitigating cir- cumstances and the appropriateness of the death penalty.

In *Proffitt* v. *Florida, supra,* the Supreme Court speci- fically upheld the Florida sentencing statute in which the jury renders an advisory verdict while the trial judge makes the actual determination of sentence. The court, at page 923, stated:

" * * * This Court has pointed out that jury sentenc- ing in a capital case can perform an important societal function, *Witherspoon* v. *Illinois,* 391 U. S. 510 * * * but it has never suggested that jury sentencing is constitutional- ly required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences simi- lar to those imposed in analogous cases."

Appellant's argument is therefore overruled.

## I C.

In his third proposition of law, appellant argues that the statutory sentencing procedure following a conviction for a capital offense places upon the accused the burden of establishing why he should not be put to death, since the death penalty is precluded only when one of the prescrib- ed mitigating circumstances is established by a prepon- derance of the evidence under R. C. 2929.04(B).

The court does not reach this issue since the record reveals that such burden was not placed on the accused. In fact, the trial judge, in response to a question by the de- fense concerning who had the burden of proof at the miti-

gation hearing, stated that: "[I]nasmuch as there is no burden, I will suggest that the state go first."

## I D.

In his fourth proposition of law, appellant argues that Crim. R. 11(C)(3) is unconstitutional in that it gives the trial judge unbridled discretion in imposing the death sentence, while at the same time discourages defendants from exercising their constitutional right to plead not guilty contrary to *United States* v. *Jackson* (1968), 390 U. S. 570.

Crim. R. 11(C)(3) reads, in part:

"With respect to aggravated murder committed on and after January 1, 1974, the defendant shall plead separately to the charge and to each specification, if any. A plea of guilty or no contest to the charge waives the defendant's right to a jury trial, and before accepting such plea the court shall so advise the defendant and determine that he understands the consequences of such plea.

"If the indictment contains no specification, and a plea of guilty or no contest to the charge is accepted, the court shall impose the sentence provided by law.

"If the indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice."

Thus, while a defendant who pleads guilty or no contest to an indictment containing one or more specifications may obtain dismissal of such specification and thus avoid the death sentence if the trial judge finds the dismissal to be in the interests of justice, a defendant who pleads not guilty must rely on the court finding the presence of one of the mitigating circumstances, enumerated in R. C. 2929.-04(B), to avoid the death sentence.

In *Gregg* v. *Georgia*, 428 U. S. 153, 49 L. Ed. 2d 859, the petitioner challenged the constitutionality of the Georgia statute, which states that the state prosecutor may negotiate a plea with selected capital defendants, and the jury, despite the fact that the evidence supports a capital verdict, may elect to find the defendant guilty of a lesser included of-

fense, rather than find him guilty of a crime punishable by death. The Supreme Court held that the existence of these discretionary stages in the sentencing procedure did not violate the holding in *Furman* v. *Georgia* (1972), 408 U. S. 238, since that case dealt with the imposition of the death sentence on an individual convicted of a capital offense, and not with acts of mercy that remove those defendants from consideration as candidates for the death penalty. The court, at page 889, stated:

"* * * Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant."

In the instant cause, appellant objects to the discretion given the trial judge under Crim. R. 11(C)(3). However, since the United States Supreme Court has never proscribed discretionary acts of mercy in which a defendant convicted of a capital offense is removed from consideration as a candidate for the death penalty, this objection is without merit.

Appellant argues further that, contrary to the *Jackson* holding, *supra* (390 U. S. 570), Crim. R. 11(C)(3) discourages defendants accused of a capital offense from exercising their constitutional right to plead not guilty.

Appellant's reliance on the *Jackson* ruling is misplaced. In that case, a defendant, pursuant to the Federal Kidnapping Act, could, by waiving his right to a jury trial or pleading guilty, avoid the sentence of death. The court, at page 583, held that such a statute "needlessly *encourages*" guilty pleas and jury waivers and thus chills the exercise of basic constitutional rights. Because the statute penalized those defendants who plead not guilty and demanded a jury trial, the clause permitting this situation was declared unconstitutional.

In the instant cause, a defendant, even if he pleads guilty or no contest, is not assured that any or all of the specifications contained in his indictment will be dismissed, since the court *may* dismiss such specification in the "interests of justice." Thus the chilling effect found in the *Jackson* case is absent in the present Ohio scheme. Furthermore, the United States Supreme Court has specifically approved of the practice of negotiating a plea. See *Gregg, supra.*

Appellant's fourth proposition of law is rejected.

I E.

In his fifth proposition of law, appellant argues that the Ohio statutory sentencing procedures place a greater risk of death on a defendant who asserts his right to a trial by jury than on a defendant who elects to be tried by a three-judge panel, since in the former situation only one judge need be convinced of the existence of a mitigating circumstance, whereas in the latter situation, the three-judge panel makes such a determination. A similar argument was discussed and rejected by this court in *State* v. *Bell* (1976), 48 Ohio St. 2d 270, and further discussion is not merited.

II.

In his sixth proposition of law, the appellant contends that the trial court abused its discretion in finding that no mitigating circumstances were established under R. C. 2929.04(B) by a preponderance of the evidence.

Two psychiatrists, Doctors Jack Morganstern and Jaime Smith e Incas, a probation officer, Mr. Ned Woodruff, the defendant's mother, Mrs. Lillian Weind, and a long-time family acquaintance, Mr. Albert Parks, were called as witnesses for the purpose of the mitigation hearing held on April 14, 1975.

Upon request of defense counsel, the court, allowing Dr. Smith e Incas additional time to review the defendant's social history and the circumstances surrounding the crime itself, continued the hearing until June 20, 1975.

Both doctors and the probation officer testified that

they found no indication that Hermalee Ross induced or facilitated the crime.

## IIA.

With respect to whether it was unlikely that the offense would have been committed but for the fact that Weind was under duress, coercion, or strong provocation, Dr. Morganstern testified that although Weind never said that he was under duress, coercion, or strong provocation, it was the doctor's conclusion that it would have been unlikely for Weind to have committed the offense without " * * * special duress, strong provocation, or some very special circumstances," since such behavior would be atypical given Weind's stable family structure, close family contact, and non-violent background.

At the first mitigation hearing, Dr. Smith e Incas likewise found it unlikely that the offense would have been committed but for the presence of any of these three factors, since Weind was an unaggressive person by nature. Although the defendant at no time indicated that he was under such pressures, the doctor observed that the defendant gave the impression of one suffering from a nightmare who was somehow brought into an unwanted and unexpected situation which later involved him in a crime.

At the June hearing, Dr. Smith e Incas changed his earlier testimony, stating that he no longer believed that duress was a factor of mitigation, since the defendant's acts were "voluntary."

R. C. 2929.04(B) provides that the death penalty "* * * is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a prepondence [*sic*] of the evidence:

" * * *

"2. It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation. * * * "

This court has recently held that " * * * duress or coercion may be established by proof that force, threat of

force, strong persuasion or domination by another, necessitous circumstances or some combination of these, has overcome the mind or volition of the defendant so that he acted other than he ordinarily would have acted in the absence of those influences." *State* v. *Woods* (1976), 48 Ohio St. 2d 127.

In the instant cause, while the doctors agreed that the defendant's involvement in the crime was highly unusual, given his behavioral history, there was no evidence adduced at trial, during the psychiatrists' interviews, or at the mitigation hearing, of any force or threat of force that could have motivated the defendant to commit the crime. Nor was there any evidence to indicate that the defendant acted out of necessity. The only evidence to indicate that a mitigating force affected the acts of the defendant was that he was easily led because he felt a need to belong, and that he was non-violent in nature.

Although this evidence suggests that the defendant may have acted under a strong domination or persuasion, it is outweighed by other evidence, such as his relationship to his co-conspirators, his motive for committing the crime, and his participation in the planning and cover-up of the crime, which suggests that his acts were voluntary.

The court affirms the trial court's determination that the defendant was not under duress, coercion, or strong provocation.

## II B.

With respect to whether the offense was primarily the product of Weind's psychosis or mental deficiency (R. C. 2929.04[B][3]), Dr. Morganstern testified that the defendant exhibited no signs of mental deficiency or psychosis at the time of the interview. Dr. Morganstern could only state that the crime for which Weind was convicted was atypical, unusual, and inconsistent with his past behavior.

Dr. Smith e Incas at first testified that the offense was not primarily the product of the defendant's psychosis or mental deficiency. However, the doctor later stated that, given the type of offense committed and the defendant's

behavioral history, the defendant was psychotic at the time of the offense. The doctor could not base his conclusion on a "reasonable medical certainty," which he defined as "the positive outweighing the negative," but did say that if he had the opportunity to review Weind's entire social history and the circumstances surrounding the crime itself, and found that there were no indications of aggressive behavior in the man's past, he could reach such a conclusion.

The court gave Dr. Smith e Incas two additional months to conduct his review. At the end of this period, the doctor, on the basis of his information, including the defendant's school profile, could not testify with a reasonable medical certainty that the defendant was suffering from a temporary psychosis at the time of the offense. He could only state that there was a "possibility of an acute break" at the time of the crime.

R. C. 2929.04(B) provides:

"Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a preponderence [sic] of the evidence:

" * * *

"(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity."

In determining whether the offense was primarily the product of psychosis, this court has stated that " * * * any mental state or incapacity may be considered in light of all the circumstances and including the nature of the crime itself * * *." State v. Black (1976), 48 Ohio St. 2d 262, 268.

In this cause, the only evidence to support the theory that the defendant suffered a psychosis at the time of the offense was Dr. Smith e Incas' opinion that since the defendant had a non-violent behavioral background, he pos-

sibly could have suffered an acute but short-lived psychotic break. The possibility of a condition is not enough to support a finding of the existence of a mitigating circumstance. Having reviewed the psychiatric reports and the evidence adduced at the mitigation hearing, this court finds no abuse of discretion of the trial court in finding that the offense was not primarily the product of Weind's psychosis or mental deficiency.

Appellant's sixth proposition of law is overruled.

### III.

In his seventh proposition of law, appellant argues that the trial court abused its discretion by failing to have Weind reexamined by different examining psychiatrists who could render an opinion as to whether the offense was primarily the product of the defendant's psychosis or mental deficiency.

Appellant notes that at the hearing neither doctor could testify with any reasonable degree of certainty as to this issue. Appellant's argument is not well taken.

Appellant never requested that the trial court obtain additional assistance from other psychiatrists. Rather, he merely requested at the first hearing that Dr. Smith e Incas be given the opportunity to explore more thoroughly and extensively the social records of the defendant.

The trial court enlisted two competent psychiatrists as evidence by their credentials noted in the record, and this court is not convinced that other psychiatrists could have done a more thorough job.

Finally, the trial court insured fairness to the defendant by continuing the hearing so that Dr. Smith e Incas would have more time to study Weind's social and behavioral history. This court finds no abuse of discretion or error here.

### IV.

In his eighth proposition of law, appellant asserts that the trial court abused its discretion by denying his request for a continuance.

Weind was arrested on December 24, 1974. Pursuant to

R. C. 2945.71 *et seq.*, the matter was set for trial on February 18, 1975. On January 28, 1975, appellant filed a motion requesting that the court grant a continuance of the trial date since the prosecuting attorney had not yet provided discovery and since the defense felt that additional time was necessary to research legal issues. On February 4, 1975, appellant was provided discovery which included a witness list of 59 people. On the following day, appellant filed a supplemental memorandum in support of the motion for a trial continuance. The court never made a formal ruling on the motion, and trial was begun on February 18, 1975.

A continuance is to be granted only upon the affirmative proof that the ends of justice require it. R. C. 2945.02. In *State* v. *Price* (1973), 34 Ohio St. 2d 43, 47, this court held that the proper test in determining whether the trial court abused its discretion in not granting a continuance is whether " * * * the defendant, in light of the record, received zealous and earnest counsel * * *" and whether appointed counsel has performed his full duty "intelligently and well."

In reviewing the record, this court finds that the defense ably tried the case. Since no prejudice appears to have been caused by the failure to grant a continuance, appellant's eighth proposition of law is without merit.

## V.

Appellant contends, in his ninth proposition of law, that the trial court erred in admitting the testimony of two witnesses for whom the prosecutor had failed to provide proper discovery.

Appellant objects to the fact that although the prosecutor had been provided by the police with a new address for witness Robert Boswell ten days before the trial, this new address was never provided to defense counsel. He also objects to the fact that information concerning the testimony of Stephen Molnar, Jr., chief firearms examiner for the Ohio State Bureau of Criminal Investigation, was provided to defense counsel only two days before trial, which, according to appellant, did not allow sufficient time

to effectively evaluate the evidence and prepare for trial.

Notwithstanding that it is unclear from the record why the defense was not promptly informed of the new address of a key prosecution witness, as required by Crim. R. 16(D), it was within the trial judge's discretion pursuant to Crim. R. 16(E) to decide what action should be taken.

In the instant cause, the defense did not raise its objection until after the prosecution completed its direct examination of the witness Boswell. Upon the objection of the defense, the trial judge conducted a discussion at the bench. Thereafter, the defense proceeded to cross-examine the witness without requesting the court for a continuance. The record does not reflect an abuse of discretion on the part of the trial judge in not imposing any sanctions or granting a continuance *sua sponte*.

With respect to the fact that information concerning the testimony of Mr. Molnar was provided to defense counsel only two days prior to trial, there is no indication that the defense was not promptly informed of the new evidence, since the items Molnar was to test were not recovered until that time. Also, the defense did not request the court for a continuance.

Appellant's ninth proposition of law is not well taken.

## VI.

In his tenth proposition of law, appellant maintains that the trial court committed prejudicial error in calling Michael Goins as a court witness and in refusing to advise the jury that the witness had been granted "use immunity."

Goins, having important information concerning Weind's involvement in the murder of Hermalee Ross, was attempting to bargain with the prosecutor for immunity against arrest for a crime in which he himself was implicated. Because Goins was uncooperative with either the defense or prosecution, the court called him as a witness.

In jurisdictions that have considered the appropriateness of a trial court calling certain individuals as the court's own witness, the practice itself has been upheld. See 67 A. L. R. 2d 538. So long as the court maintains its

impartiality and does not assume the role of an advocate, such practice does not prejudice the rights of the defendant to a fair and impartial trial.

In the instant cause, the trial court called Goins as a witness and allowed both the defense and prosecution equal opportunity to cross-examine the witness. There is no evidence to show that the court lost its impartiality.

Appellant also asserts that reversible error was committed when the trial judge refused to state specifically to the jury that Goins was granted "use immunity." This argument lacks any merit.

The judge did adequately instruct the jury before Goins was permitted to testify that any testimony Goins offered in the court room would not be used as evidence against him in any other action. The simple fact that the judge refused to specifically mention "use immunity" in his instruction to the jury in no way prejudiced appellant's rights and, if anything, prevented confusion.

## VII.

In his eleventh proposition of law, appellant, citing R. C. 2941.25, contends that the trial court committed prejudicial error by failing to require the prosecution to submit either the charge of murder for hire or of murder while committing a kidnapping offense to the jury.

In *State* v. *Osborne* (1976), 49 Ohio St. 2d 135, this court held that R. C. 2941.25 does not require the prosecution to elect which aggravated murder count will be submitted to the jury, but only prevents conviction under both counts. Thus appellant's eleventh proposition of law is overruled.

## VIII.

In his twelfth proposition of law appellant maintains that the court erred in failing to instruct the jury to disregard all testimony regarding the existence or contents of a tape recording of a conversation between two witnesses.

The tape recording in issue was obtained by a police detective at Boswell's residence on February 19, 1975, with Boswell's permission, and concerned a conversation be-

tween Boswell and Goins about the Ross abduction and murder.

At trial, the prosecution attempted to introduce the contents of the tape to impeach certain statements made by Goins, but was denied by a ruling of the trial judge upon motion of the defense.

The defense did not request a jury instruction concerning the tapes at that time, nor did it request such an instruction at the conclusion of the trial court's instruction to the jury.

In paragraph five of the syllabus in *State* v. *Lockett* (1976), 49 Ohio St. 2d 48, this court held that:

"In the absence of plain error; under Crim. R. 52(B), an appellate court will not not review alleged errors in the giving or failure to give instructions to a jury, unless the party objects thereto before the jury retires to consider its verdict, pursuant to Crim. R. 30."

In the instant cause, failure of the trial judge to give the jury specific instructions regarding the tapes did not constitute an error that affected the defendant's "substantial rights" under Crim. R. 52(B), since mention of the tapes by the judge would have called the jury's attention to them to the prejudice of the defendant.

Since appellant failed to timely object to the jury instructions, and since plain error was not involved, appellant's twelfth proposition of law is rejected.

## IX.

In his thirteenth proposition of law, appellant asserts that the jury verdict of guilty was not supported by sufficient evidence, and that it was error for the trial court to overrule motions of the defense for acquittal.

On the morning of December 15, 1974, the body of Hermalee Ross was found in an abandoned schoolhouse in Delaware County. The record provides convincing evidence linking Weind to this abduction and murder.

Robert Boswell, an acquaintance of Weind and Goins, testified that between the hours of 10:30 and 11:00 a. m. on

December 15, 1974, Weind came to his apartment and gave him as a gift a .25 caliber Raven automatic, identified later as the murder weapon (the same type of weapon which was given to Mrs. Alberta Osborne by her former employer approximately a year earlier). After Weind left his apartment, Boswell told a friend, Michael Goins, about the gift. Goins warned Boswell that the "gun was hot."

Later that same day, Weind returned to Boswell's apartment, and described to Boswell and Goins the events surrounding the abduction and murder of Hermalee Ross. According to Boswell, Weind stated that he and Carl Osborne were responsible for the murder and that Carl actually fired the fatal shots. Weind told Boswell that when Mrs. Ross struggled on the Ontario store parking lot, he hit her on the head with a gun which Boswell said he knew to be a .38 caliber automatic. Weind also stated that when he struck her with this weapon, a piece of it broke off. Through later investigations, the police recovered two pieces of metal from the parking lot, which were later identified as pieces broken from the trigger guard of a .38 caliber automatic similar to one purchased by the police from a gun store in Hilliard, Ohio.

Boswell testified that after Weind related the above events, he, Weind, and Goins went in Weind's car to Alum Creek to dispose of the weapon. Because of information provided by Goins, the police were able to retrieve this same weapon from Alum Creek on December 19, 1974. A ballistics expert testified that the bullets found imbedded in the floor boards of the schoolhouse, and the bullets taken from the victim, were fired from the very same .25 caliber Raven automatic.

Boswell also testified that during the conversation between the defendant, Goins, and Boswell, Goins discussed with the defendant money owing on a .38 caliber automatic that Goins allegedly supplied Weind. According to Boswell, Weind stated that when he received the payoff from Mrs. Osborne of $500, he would pay what he owed on the weapon.

Debbie Zweydorff and Kay Osborne testified as to the

whereabouts of Weind on the evening of December 14, 1974, and the following morning.

Debbie testified that Weind had been with Carl at the Osborne home that evening, and that Carl and Weind had left to get some beer, returning together shortly after 2:00 a. m. Kay confirmed this testimony and added that Weind was at the Osborne home talking to Carl and Mrs. Osborne sometime after 4:30 a. m. when Kay returned home. Both Debbie and Kay agreed that Carl had come into the room where they were sleeping and told Kay that he and Weind were going to use her car to get breakfast.

Debbie testified further that, at about 10:00 a. m., Carl and Weind returned to the Osborne home, and that Carl told Mrs. Osborne to come outside to see something; that she saw Mrs. Osborne return to the house to get a bucket of water and go outside and remain there with Weind and Carl for about half an hour; that upon returning to the house, the three began looking through the telephone book for a professional cleaner; and that following Mrs. Osborne's instructions, Kay drove her mother's car to work that day. Kay confirmed this testimony.

On December 16, 1974, Mrs. Osborne took Kay's car to a gasoline service station to replace all four tires. Weind arrived about 45 minutes later with Carl, and it was Weind who directed the serviceman to use the bald tire as a spare. That afternoon, Kay noticed that her car had been thoroughly cleaned.

On December 20th, a search warrant was executed on Kay's car. Blood stains from the seat of the car and from the outside chrome strip were determined to be of blood group A, the very same grouping of the victim's blood.

In summary, there was ample evidence to justify the jury's finding of guilt as to all counts and the specifications, and the trial court's conviction of the defendant as to the charges of kidnapping and murder for hire.

## X.

In his fourteenth proposition of law, appellant urges

that it was plain error, pursuant to Crim. R. 52(B), not to declare a hung jury after the jury requested to rehear the testimony of four witnesses and the judge's instruction as to one charge, since the replayed testimony was "so substantial."

The practice of allowing the jury to rehear all or part of the testimony of any witness has been specifically upheld by this court in paragraph four of the syllabus in *State* v. *Berry* (1971), 25 Ohio St. 2d 255, and is within the sound discretion of the trial court to permit.

In the instant cause, part of the testimony the jury asked to rehear involved the testimony given by one of the defendant's own alibi witnesses. Moreover, the trial court, in allowing the jury to rehear its instructions concerning one charge, specifically warned the jury not to overemphasize this charge with respect to any other part of the instructions.

Since the record shows no abuse of discretion affecting the appellant's substantial rights, appellant's fourteenth proposition of law is overruled.

## XI.

In his fifteenth proposition of law, appellant contends that the trial court committed prejudicial error in admitting certain hearsay testimony.

At issue is the testimony of Kay Osborne and Debbie Zweydorff concerning the statement made by Carl Osborne to Kay early in the morning of December 15, 1974, in which Carl stated that he and the defendant were going to use Kay's car to get breakfast. Although the statement was hearsay testimony, the court admitted it on the grounds that there was ample evidence to establish prima facie that a conspiracy did in fact exist between Carl Osborne and the defendant.

This court held in *State* v. *Osborne, supra,* that:

"Where the existence of a conspiracy has been established by other evidence, an extrajudicial statement of a co-conspirator, made in furtherance of the objectives of

that conspiracy, is admissible as an exception to the hearsay rule. * * *"

See, also, paragraph two of the syllabus in *State* v. *Carver* (1972), 30 Ohio St. 2d 280.

In the instant cause, the admission the defendant made to Boswell and Goins of his participation with Carl Osborne in the crime, and the testimony of the service station attendant and the blood-grouping analyst indicating defendant's involvement in the cover-up along with Carl and Alberta Osborne, were sufficient evidence that a conspiracy existed prima facie between Carl Osborne and the defendant. Thus, the statement made by Carl Osborne to his sister Kay was admissible as an exception to the hearsay rule.

Accordingly, appellant's fifteenth proposition of law is without merit.

## XII.

In his sixteenth and final proposition of law, appellant contends that the trial court erred in failing adequately to protect jury members against trial publicity, and in not granting a mistrial because of such publicity.

On the day after jury selection, the defense called the court's attention to a newspaper article mentioning an offer of a plea bargain that had appeared in the February 18, 1975, afternoon edition of a Columbus newspaper. The court questioned each juror as to whether he or she had read any newspaper article in any edition of the prior day's newspaper, and each answered he had not. The defense made no objection after this inquiry. Later in the trial, a defense assistant told the court that he had seen two jurors reading a newspaper although he could not see which articles they were reading. He also stated that he saw a third juror carrying a newspaper under his arm into the courtroom. Apparently, there had been an article in the morning newspaper concerning the contents of a tape recording that was not admitted in evidence. The defense moved for mistrial The court then questioned each juror as to whether he or she had heard or read anything about what might have occurred in court or in the judge's

242

chambers concerning the case. Apparently no one had, and the trial continued. The trial judge, on several occasions, instructed the jury not to read any newspaper accounts nor watch or listen to news broadcasts concerning the case.

The record shows that the trial court took the appropriate action to insure a fair and impartial trial, and this court finds no abuse of discretion on the part of the court in refusing defendant's motion for a mistrial.

Accordingly appellant's sixteenth proposition of law is overruled.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT, CELEBREZZE, W. BROWN, P. BROWN, SWEENEY and LOCHER, JJ., concur.