OPINION
{¶ 1} The state of Ohio appeals from an order granting a motion to suppress a statement made by the defendant, Jessica Salvatore, to a detective of the Columbus Division of Police and to a Columbus Fire Department arson investigator. For the reasons which follow, we affirm the trial court's ruling.
 {¶ 2} Ms. Salvatore has a long history of mental illness. On October 23, 1999, a fire occurred at the residence Jessica shared with her grandfather. Jessica's grandfather died in the fire. Soon thereafter, Jessica was admitted to Harding Hospital, a Worthington, Ohio hospital for treatment of people with serious mental health problems.
 {¶ 3} On November 3, 1999, Columbus Fire Department Arson Investigator Josh Brent went to Harding Hospital to interview Ms. Salvatore. After only a brief interview, Jessica told Mr. Brent that she did not want to talk anymore, so their discussion ended for the day. While the November 3 interview is not the subject of this appeal, it did lead to a subsequent, substantive interview which gives rise to the instant case.
 {¶ 4} One week later, Investigator Brent and Columbus Police Detective Timothy Huston went to Harding Hospital in a second attempt to interview Ms. Salvatore. Detective Huston had a tape recorder concealed under his clothing. Jessica told the police officer that she had set the fire which killed her grandfather. She viewed her grandfather as an alien who had been beaming thoughts into her brain. She believed her grandfather had molested her in the past. As discussed infra, Jessica's statements made during this November 10, 1999 interview are the lone subject of this appeal.
 {¶ 5} As a direct result of her November 10 statements, Ms. Salvatore was indicted in December 1999 by a Franklin County grand jury, charged with two counts of aggravated murder with death penalty specifications and one count of aggravated arson. With the assistance of appointed counsel, she entered a plea of "not guilty by reason of insanity." Counsel also filed a motion to suppress her statement to the police officer and arson investigator. As noted above, the motion to suppress was sustained by the trial court.
 {¶ 6} On appeal, the state of Ohio assigns a single error for consideration:
 {¶ 7} "The trial court abused its discretion in suppressing defendant's confession."
 {¶ 8} Over two hundred years ago, the Bill of Rights of the United States Constitution was ratified. TheFifth Amendment to the United States Constitution reads, in pertinent part:
 {¶ 9} "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * * nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law * * *." (Emphasis added.)
 {¶ 10} The Fifth Amendment has been applied to the individual states through operation of the Fourteenth Amendment. An extensive body of the law has developed to aid courts in determining when an individual has been compelled to be a witness against herself or himself — when an involuntary or otherwise legally flawed statement has been obtained for use to convict a person of a serious crime.
 {¶ 11} Because being in police custody necessarily causes duress to the person being interrogated or "interviewed," the Supreme Court of the United States has developed well-established safeguards to protect the constitutional rights of citizens of the United States. These safeguards include, inter alia, explicit advice about constitutional rights, commonly known as "Miranda warnings." Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602. The very essence of Miranda warnings is to ensure that persons in custodial situations make statements knowingly, intelligently, and voluntarily. Id.
 {¶ 12} For Miranda to apply, it must first be established that the subject being interrogated was indeed "in custody." In the court below, as well as before this court, the state urges an initial finding that Ms. Salvatore was not "in custody" during the "interview" session with the arson investigator and police detective at Harding Hospital. Therefore, according to the state, compliance with Miranda was unnecessary. The trial court explicitly disagreed, as do we.
 {¶ 13} "Custodial interrogation" means questioning or interviewing initiated by law enforcement officers after a person has been taken into custody "* * * or otherwise deprived of his freedom of action in any significant way." Miranda at 444. (Emphasis added.) See, also, State v. Maurer (1984), 15 Ohio St.3d 239. In determining whether an individual is in custody when that person has not been formally arrested, the inquiry requires consideration of all circumstances, particularly one critical determination — the degree to which one's "freedom of movement" was restrained. As this court has stated, the test to determine "custody" for Miranda purposes "* * * is whether, under the totality of the circumstances, a reasonable person would have believed that he was not free to leave." In the Matter of: Sherrin (May 26, 1998), Franklin App. No. 97APF10-1378, unreported, citing State v. Gumm (1995),73 Ohio St.3d 413. See, also, State v. Simpson, Franklin App. No. 01AP-757, 2002-Ohio-3717, at ¶ 33.
 {¶ 14} As discussed below, many of the pressures inherent in situations which involve police interrogation of individuals in police custody are readily identifiable here. The significant facts surrounding Ms. Salvatore's "custody" in the mental hospital are essentially undisputed. She was not free to leave the locked, secure psychiatric institution in which she was being treated. She could not simply leave, go home, or go anywhere else at her immediate discretion. She was in the custody of Harding Hospital, being interviewed by two law enforcement officers who had apparent authority to be on the premises. She had been escorted to the interview room by hospital staff, implying that the officers had at least the cooperation of the hospital staff who were overseeing her treatment. Based upon these and other factors, the trial court found that Ms. Salvatore was in custody when she was interviewed. We concur. Therefore, as a threshold matter, the trial court did not abuse its discretion in finding that Ms. Salvatore was "in custody" for purposes of compliance with Miranda.
 {¶ 15} Having determined that the trial court properly determined the custody issue, we look now to the remaining considerations required in a Miranda analysis.
 {¶ 16} In State v. Dailey (1990), 53 Ohio St.3d 88, at 91-92, the Supreme Court of Ohio examined a claimed defective Miranda warning. In its analysis, the court spoke to some of Miranda's essential implications and requirements which are of guidance here:
 {¶ 17} "In Miranda the court recognized that custodial interrogations by their very nature generate `compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' Miranda, supra, at 467; Moran [v. Burbine (1986), 475 U.S. 412] * * * at 420. To combat this inherent compulsion and thereby protect a suspect's Fifth Amendment
privilege against self-incrimination, the Supreme Court has held that a suspect may effectively waive the rights conveyed in the Miranda warnings only if the waiver is made voluntarily, knowingly, and intelligently. Miranda, supra, at 444, 475.
 {¶ 18} "The inquiry whether a waiver is coerced has two distinct dimensions. `First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' Moran, supra, at 421; Colorado v. Spring (1987), 479 U.S. 564, 573. * * *
 {¶ 19} "A suspect's decision to waive his Fifth Amendment
privilege is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. Colorado v. Spring, supra, at 574. See, also, State v. Black (1976), 48 Ohio St.2d 262 * * * paragraph four of the syllabus * * *. Thus, coercive police activity is a necessary predicate to finding that a confession is not voluntary within theFifth Amendment, on which Miranda was based. Colorado v. Connelly (1986),479 U.S. 157, 170." See, also, State v. Otte (1996), 74 Ohio St.3d 555.
 {¶ 20} This court has consistently followed the foregoing principles, summarizing in State v. Portis, Franklin App. No. 01AP-1458, 2002-Ohio-4501, the essential requirements of Miranda as follows:
 {¶ 21} "Defendant correctly points out that the fact that he signed a Miranda waiver does not provide conclusive proof that the waiver was knowingly and intelligently made. State v. Scott (1980),61 Ohio St.2d 155 * * * paragraph one of the syllabus. Instead, the determination of whether a defendant knowingly and intelligently waived his Miranda rights involves a two-step inquiry:
 {¶ 22} "`First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.' Moran v. Burbine (1986), 475 U.S. 412, 421 * * *." Id. at ¶¶ 18-19. (Emphasis added.)
 {¶ 23} The trial court's decision granting the suppression motion is comprehensive, detailed and in full accord with the state of the record before us. It is well-established that the trial judge sits as the trier of fact in deciding whether the state has met its burden of proving that a defendant's statement was given in accord with the mandates of Miranda. See, State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. As the decision tracks the evidence adduced at the hearing with accuracy and specificity, and evinces the trial court's reasoning in granting the motion, we quote it at length:
 {¶ 24} "* * * The defendant is severely mentally ill, has undergone three (3) separate competency evaluations to stand trial herein because of repeated decompensation when held in jail and was ordered to Twin Valley Behavioral Health, Timothy B. Moritz Forensic Unit, for treatment and to maintain her competency until trial. * * *
 {¶ 25} "* * *
 {¶ 26} "At the suppression hearing[,] the defendant presented the expert testimony of Dr. Daniel L. Davis, a psychologist who is a forensic psychology expert, who explained to the Court what standards or tests are used to determine competency to waive Miranda rights. Dr. Davis stated on direct examination that competency to waive Miranda rights is determined on much the same basis as competency to stand trial.
 {¶ 27} "Dr. Davis stated that competency to waive Miranda rights is determined by a two-pronged process: 1) ascertaining the subject's state of knowledge of rights that are waived pursuant to a Miranda warning; i.e., is it reasonable to assume that the subject had knowledge of Miranda rights at the time of the waiver and understood the consequences of waiving them, and 2) ascertaining the signs and indices of mental illness at the time of waiver and whether the mental illness, if at all, precluded or interfered with the subject's knowledge of those rights and understanding of the consequences of waiving them. Dr. Davis stated on direct examination that there is no specific test for `going back in time', but rather, an evaluator would review the totality of circumstances with as much information as possible, making the necessary inferences to determine competency at the time of the waiver of Miranda rights. * * *
 {¶ 28} "Dr. Davis further testified that delusion can impair judgment and that knowledge of Miranda rights or of the consequences of waiving them could be impaired by the existence of such a condition. He further noted that a delusional person could believe they had done something they had not really done. Dr. Davis also noted that depression can impair a person's judgment in inhibiting cognitive energy to `think things through,' seeing bleaker outcomes, seeing oneself as a far worse person, and promoting suicidal and self-mutilating behaviors and hopelessness.
 {¶ 29} "Dr. Davis testified that from his review of the defendant's medical records at Harding Hospital following the incident for which she had been indicted, the medical staff there tried to stabilize her medication, and that the administration of certain medications worsened her condition. Prior to and on November 9, 1999, the defendant had been diagnosed as being depressed. On November 9, 1999, she was prescribed and administered the antidepressant, Wellbutrin, which was discontinued eight (8) days later, because it exacerbated her psychotic state.
 {¶ 30} "As to the nature of defendant's mental illness on November 10, 1999, the date of her statement in question, Dr. Davis provided the following opinion. He stated that the defendant suffered from a major mental illness, bipolar disorder. She required supervision. She was psychiatrically unstable with depression, delusion and psychosis, and this condition, alone, he stated, would have been good cause for an evaluation of her competency to waive her Miranda rights.
 {¶ 31} "* * * Dr. Davis was cross-examined by the state * * *. During Dr. Davis' cross-examination, he testified that he had reviewed all of Jessica Salvatore's medical records, which were lengthy. He reviewed records from mental health treatment centers or facilities in Delaware, Ohio; Netcare, Inc in Columbus, Ohio; Harding Hospital in Worthington, Ohio; Riverside Hospital and The Ohio State University Hospital in Columbus, Ohio; and Netcare Access, in Columbus, Ohio. The defendant is twenty-five (25) years old and has received treatment for mental illness since she was at least sixteen or seventeen years old. Dr. Davis noted that her records also reflected repeated diagnosis for `polysubstance abuse' with a history of problems with substance abuse, including marijuana, LSD, and cocaine.
 {¶ 32} "Under cross-examination[,] Dr. Davis testified that the administration of the drug Wellbutrin caused the defendant problems. He testified that even though she had been administered this drug in this past, this time it pushed her into a manic or psychotic state. While it is clear to the Court that the defendant has an above average level of intelligence, that is, to understand her rights in a Miranda waiver setting, it is not clear to the Court that her condition did not interfere with her understanding of the waiver of those rights or to do so in a knowing, voluntary and intelligent fashion.
 {¶ 33} "Jessica Salvatore was administered Wellbutrin for depression beginning November 9, 1999, one day prior to her confession to law enforcement officials [the arson investigator, Josh Brent] while at Harding Hospital. On November 9, 1999, the records reflect a `mixed presentation' according to Dr. Davis. Her behavior was unusual and odd, and Dr. Davis had noted in the records descriptions of depressed behavior. Following administration of Wellbutrin, the records of Harding Hospital indicated that defendant started feeling good with expanded mood, not worried. According to Dr. Davis, she was beginning to demonstrate physical signs of mania such as cleaning her room and being more behaviorally agitated. Specifically, Dr. Davis opined that certain of her behaviors that the Harding Hospital staff described just prior to her statements to the police detective and arson investigator while at Harding Hospital [on November 10, 1999] could be interpreted as the beginning of a bi-polar episode.
 {¶ 34} "Dr. Davis further testified that the records of The Ohio State University contained notations that the defendant has a history of being a `habitual liar,' and the court-appointed psychologist, Dr. Haskins, who evaluated the defendant for competency to stand trial, had noted a personality disorder diagnosis. Dr. Davis testified on cross-examination that `knowing' is a functional definition, that one must not only have capacity to understand their rights, but the ability to use that understanding. While Dr. Davis had not been authorized to evaluate the defendant for competency to waive her Miranda rights, he opined that the indices in the medical records pointed to the onset of a manic episode at the time she waived them and confessed to purposely setting the fire that killed her grandfather. The state did not present any expert testimony to counter this evidence." (May 5, 2002 Decision at 2, 7-11; emphasis added.)
 {¶ 35} The trial court correctly noted that the state bears the burden of proof to show by a preponderance of the evidence that the defendant competently waived her Miranda rights, citing State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus. Edwards further instructs courts to evaluate Miranda issues in light of the "totality of the circumstances," particularly in the "voluntariness" analysis. Circumstances to be considered include, inter alia, "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." Id. at 40-41. See, also, State v. Campbell (2000), 90 Ohio St.3d 320, at 332
(recognizing "medical treatment" or deprivation thereof in the nonexhaustive list of Edwards factors).
 {¶ 36} In further concluding that the state failed to satisfy its burden, the trial court spoke in detail as to the state of the evidence presented:
 {¶ 37} "The state offered the testimony of the defendant's attending psychiatrist at Harding Hospital, Dr. Richard A. Freeland. Dr. Freeland testified that he did not talk to police or authorize them to talk to the defendant at Harding prior to their doing so on November 10, 1999. Dr. Freeland stated that if he had authorized it[,] he would have entered it in his notes. He also stated under cross-examination that if he had been asked to determine if defendant was competent to waive her Miranda rights, he would have noted that as well. * * *
 {¶ 38} "Dr. Freeland stated that `psychotic' means that one is inaccurately integrating perceptions, past, present and future. He stated that delusions are a symptom of psychosis. He further stated that `bi-polar' is severe mental illness and that on November 10, 1999, Jessica Salvatore was severely mentally ill.
 {¶ 39} "The state offered the testimony of the police detective and arson investigator along with a muffled tape interview of the defendant in which few words from the defendant were discernible. In the taped version of the reason of defendant's rights under Miranda, the rights waiver discussion lasted little more than two (2) minutes, and this is despite the admission by the detective that he knew the defendant was bipolar with psychotic episodes and had delusions. Moreover, when the defendant assented to waiving her rights and signing the form, the word, `wonderful' on the part of the detective is evident on the taped interrogation." (Decision at 11-12; emphasis added.)
 {¶ 40} The trial court further assailed the state's evidence in meticulously evaluating the testimony of the law enforcement officers involved, summarized as follows:
 {¶ 41} "The police detective [Huston] admitted on cross-examination that this was the first time he had interrogated someone at Harding Hospital or at any mental hospital that is a secure facility. He further admitted that he never asked the defendant what a courtroom was, what a lawyer does or what it means to remain silent. The tape recording of the interview presents muffled voices except for that of the detective. The detective also admitted that if the defendant had answered `no' to the rights waiver questions, he would have asked the questions differently or tried to explain them better.
 {¶ 42} "The detective further stated that the reason he concealed a tape recorder used to record defendant's interrogation (which he testified was either taped to his leg under his pants or in his jacket pocket), was because when individuals are interviewed with a tape recorder (i.e. if her were to set it on the table in front of them), they become less at ease in the interview and are less apt to talk freely. The evidence is uncontroverted that the defendant was not informed that her conversation with the law enforcement officials * * * was being recorded.
 {¶ 43} "The detective specifically stated that he and the arson investigator had to be let into Harding Hospital, which was a locked facility, in order to speak with the defendant, and the defendant was escorted by Harding staff to meet with him and the arson investigator in a room near the front desk of the hospital. Further evidence at the hearing indicates that the defendant could not leave the facility unless she provided the facility three (3) days' notice, during which time the facility could seek to retain her at the facility by court order.
 {¶ 44} "The arson investigator testified that when he had attempted to interview the defendant on * * * (November 3, 1999) she had looked over both shoulders and `didn't act right.' He testified that on * * * November 10, 1999, he was concerned about getting a statement from her but that on that occasion she seemed very coherent and normal and directly answered when he spoke to her.
 {¶ 45} "The only evidence the state offers * * * to prove by a preponderance of the evidence that defendant was competent to waive her Miranda rights are the statements of the law enforcement officials who presented her with her rights and who took her confession, and the medical records as identified by her attending psychiatrist who was responsible for her psychiatric care while she was at Harding Hospital while he attended ten to twelve patients at a time. The psychiatrist, Dr. Freeland, had no independent recollection of his treatment of the defendant and could only speak from the records. When the law enforcement officials questioned the defendant while at Harding, no staff person from Harding was present in the room where the interrogation was conducted." (Decision at 12-14; Emphasis added.)
 {¶ 46} The state relies upon a few cases from other appellate jurisdictions in which hospitalized witnesses were ultimately deemed to be in noncustodial situations. The state emphasizes that in those limited cases cited, a defendant had gone to a hospital seeking medical treatment and that a "room inside a hospital is a place `that persons typically feel free to leave'". (Brief of appellant at 8; citation omitted.) We summarily reject reliance upon such cases as inapposite. Among other facts, most significant is the blatant distinction that these witnesses were in hospitals as the result of physical injuries, with comparatively minimal restricted freedom of movement, and were hardly of a comparable mental state and circumstance as Ms. Salvatore. Comparison of these "hospital" patients is, at best, misplaced.
 {¶ 47} Our independent review of the record establishes that the trial court's findings more than adequately support its determination that Ms. Salvatore was, for purposes of compliance with Miranda, in custody.
 {¶ 48} As noted by the trial court several times in its decision, the evidence clearly established that Ms. Salvatore could not leave Harding Hospital, a locked, secure mental health facility, without providing at least three days' notice; furthermore, the sole purpose of the three-day period was to allow the hospital to obtain a court order to keep her involuntarily.
 {¶ 49} Having determined that Ms. Salvatore was in a custodial situation, other factors as set forth infra were considered by the trial court when it proceeded to find that the state of Ohio had not satisfied its burden of proving that Ms. Salvatore knowingly, intelligently, and voluntarily waived her Fifth Amendment rights. The state counters that, assuming arguendo, this court concurs with the trial court's custody determination, that law enforcement complied with Miranda and produced a valid confession. The state argues that the trial court abused its discretion in finding that the state failed to prove that Ms. Salvatore knowingly, intelligently, and voluntarily waived her Miranda rights.
 {¶ 50} As discussed above, the trial court was concerned that the tape recorded transcript revealed a "rote" recitation of the Miranda warnings, approximately two minutes of explanation of those rights to an obviously mentally-impaired, heavily-medicated witness. As her counsel observes, the tape is inaudible in many parts, and Ms. Salvatore's responses to many questions were typically monosyllabic or of the "uh-huh" variety.
 {¶ 51} As indicated infra, Ms. Salvatore has suffered a long history of mental illness, leading to a hospitalization during which law enforcement officers decided that they wanted to interview her in hopes of obtaining an incriminating statement from her. She told her first interviewer, "I don't want to talk anymore." Despite her statement, the same investigator, accompanied by a detective with a concealed tape recorder, returned one week later to the mental hospital in hopes of having a longer conversation which was more incriminating. A long interview did, in fact, occur.
 {¶ 52} The state of Ohio argues that Jessica knowingly, voluntarily and intelligently waived her constitutional rights when she was interviewed. The state argues that the trial court abused its discretion in finding that the interview of mental patient Ms. Salvatore at a mental hospital did not demonstrate a knowing, intelligent and voluntary waiver of her right to remain silent. In the context of the facts of this case, to state that argument is to demonstrate its weakness.
 {¶ 53} As noted by the trial court, Ms. Salvatore was not in "traditional" police custody when she was interviewed, but, again, she clearly was not free to leave the mental hospital. She was in the custody of the mental hospital. She was in custody in the mental hospital because she was demonstrating signs of her serious mental illness. She really was not capable of a knowing and intelligent waiver of her constitutional right to silence under the circumstances.
 {¶ 54} The state of Ohio acknowledges, but minimizes the importance of, the fact that Ms. Salvatore was on psychotropic medication when the second interview occurred.
 {¶ 55} We are not presented with the situation presented in Colorado v. Connelly (1986), 479 U.S. 157, 107 S.Ct. 515, where a person who was mentally ill approached a police officer on the street and blurted out a murder confession after receiving a full recitation of his rights in accord with Miranda. The state's reliance upon Connelly is, therefore, misplaced.
 {¶ 56} As delineated above, the trial court had extensive expert testimony before it when it suppressed the statement. Psychologist Daniel L. Davis's testimony regarding Ms. Salvatore's competence, or lack thereof, to waive her rights that day is especially significant. Dr. Davis noted that she had begun taking Wellbutrin for depression the day before the interview and that she demonstrated evidence of beginning a manic phase of her bipolar disorder at about that time. The Wellbutrin was in addition to Haldol, Cogentin and Lithium.
 {¶ 57} In summarizing its factual and legal conclusions, the trial court found that Ms. Salvatore's confession "* * * was not a product of a free and deliberate choice of the defendant, but rather, the product of intimidation, coercion and/or deception by the law enforcement officials. The defendant's capacity for self-determination was critically impaired by such conduct of the law enforcement officers in a custodial setting. The defendant's waiver of her Fifth Amendment rights was not voluntary." (Tr. 20-21.)
 {¶ 58} The trial court was clearly within its discretion to find that the state of Ohio had not demonstrated a knowing, intelligent and voluntary waiver of Jessica's constitutional rights.
 {¶ 59} The assignment of error is overruled. The suppression of the statement is affirmed.
Judgment affirmed.
DESHLER and BROWN, JJ., concur.