[Cite as *State v. Jones*, 2013-Ohio-5915.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.  12 MA 181 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| COLUMBUS JONES, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Criminal Appeal from Common Pleas
                               Court, Case No. 11CR167.

JUDGMENT:                      Affirmed.


APPEARANCES:
For Plaintiff-Appellee:         Attorney Paul Gains
                                Prosecuting Attorney
                                Attorney Ralph Rivera
                                Assistant Prosecuting Attorney
                                21 West Boardman Street, 6th Floor
                                Youngstown, Ohio  44503

For Defendant-Appellant:        Attorney J. Dean Carro
                                Attorney Lori Curd
                                Attorney Rodney Baca
                                Appellate Review Office
                                University of Akron School of Law
                                Akron, Ohio  44325-2901

JUDGES:
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                                Dated:  December 4, 2013

VUKOVICH, J.

{¶1} Defendant-appellant Columbus Jones appeals after being convicted of murder, improper discharge of a firearm into a habitation, and ten counts of felonious assault based upon the shooting of multiple victims at a fraternity house. He argues that his convictions were contrary to the manifest weight of the evidence, contending that there was not credible evidence that he was a shooter. Appellant also urges that the improper discharge conviction should be merged into the other convictions. He then raises issues with certain gruesome photographs and with the admission of clothing which tested positive for gunshot residue. For the following reasons, these arguments are overruled, and the judgment of the trial court is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶2} On February 5, 2011, a fraternity hosted a party at a hall in Liberty. At the end of the party, it was announced that an after-party would take place at the Omega Psi Phi fraternity house on Indiana Avenue in Youngstown. Thus, around 2:00 a.m. on February 6, 2011, fifty to sixty individuals arrived at the fraternity house. Appellant Columbus Jones arrived with Braylon Rogers and driver Marqueal Smith. Appellant's brother Mark Jones came with Demetrius Wright, Brandon Carter, and Jamelle Jackson.

{¶3} At least two scuffles occurred on the dance floor at the fraternity house. First, an intoxicated female kept bumping into Braylon Rogers, who reacted angrily and called her a "bitch." When Dannie Williams (who was her brother and a professional boxer in town for training) interceded, Braylon Rogers punched him. Fellow boxer, Victor Toney, then encouraged Dannie to leave the party. (Tr. 1765). They left but soon returned with another boxer, Durrell Richardson, who thought he could sort things out because he knew both Braylon Rogers and appellant Columbus Jones.

{¶4} Durrell Richardson approached Braylon Rogers with his hand extended, but Braylon Rogers smacked his hand down. (Tr. 1821). At some point, Dannie Williams swung on Braylon Rogers and was then tackled by someone he believes was appellant Columbus Jones. His sister hit the person who tackled him in the head

with her high-heeled shoe, and appellant was thereafter seen bleeding from a cut in his head. (Tr. 1768).

{¶5} The fraternity brothers pushed the fighters out of the back door and shut off the music. Fraternity brother Jamail Johnson was in the back doorway trying to calm down a man with a gun; the gunman appeared to be after Durrell Richardson, who was behind Jamail Johnson. Dannie Williams identified that gunman as Jamelle Jackson, one of the people appellant was with that night. (Tr. 1774). Braylon Rogers and appellant Columbus Jones were also seen facing the back of the house with guns drawn. (Tr. 1832).

{¶6} More than twenty bullets from two different guns were then fired toward the house as people were trying to exit the back door due to the indications that the party was over. Jamail Johnson died from .40 caliber gunshot wounds to the back of the head and the back of the leg. Multiple other victims were shot but survived.

{¶7} While hospitalized for a gunshot wound to the back of the thigh, Durrell Richardson told police that two of the people pointing guns at him just before the shooting started had the first names Braylon and Columbus. (Tr. 2178). Based on this information, the police compiled photographic arrays, and he identified appellant Columbus Jones and Braylon Rogers. (Tr. 1832, 2181-2182). These two were arrested that same day.

{¶8} Braylon Rogers, who claimed he was armed with but did not fire a .9mm handgun during the shooting, soon told police that the shooters were Jamelle Jackson, who had a .45 caliber handgun out, and appellant Columbus Jones, who had a .40 caliber handgun out. Based upon his provision of Jamelle Jackson's name, police showed an array to the female victim who had been shot through the face, and she identified Jamelle Jackson as the person she saw holding a silver gun in an angry manner while Jamail Johnson tried to calm him down. (Tr. 1176, 1186, 2238-2239).

{¶9} Appellant was indicted for two alternative counts of murder, eleven counts of felonious assault (one for each of the shooting victims who survived), and improper discharge of a firearm into a habitation, all with firearm specifications. (One

of these felonious assault counts was dismissed by the state at trial, and a weapon under disability count was dismissed by the state after trial). Appellant's case was tried to a jury after the state's request for joinder was denied. The jury found appellant guilty of the offenses and accompanying firearm specifications discussed above.

{¶10} The court sentenced appellant to fifteen years to life for murder (the alternative murder count was merged), eight years on two of the felonious assault counts, six years on the other eight counts of felonious assault, and eight years for improper discharge all to run consecutive to each other and to a three-year sentence on the merged firearm specifications for a total sentence of 92 years to life. Appellant filed a timely notice of appeal from the September 6, 2012 sentencing entry.

ASSIGNMENT OF ERROR NUMBER ONE

{¶11} Appellant's first assignment of error provides:

{¶12} "APPELLANT JONES' CONVICTIONS FOR MURDER, FELONIOUS ASSAULT, AND IMPROPER DISCHARGE OF A FIREARM INTO A HABITATION WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF SECTION 3, ARTICLE IV OF THE OHIO CONSTITUTION, CREATING A MANIFEST MISCARRIAGE OF JUSTICE BECAUSE THE MANIFEST WEIGHT OF THE EVIDENCE SHOWED THAT APPELLANT JONES DID NOT DISCHARGE A WEAPON AT THE SCENE."

{¶13} Appellant's only argument here is that there was not credible evidence that he fired any shots because there existed inconsistent testimony, the scene was chaotic, and the testimony of Braylon Rogers was self-serving. He points to conflicting identifications and the identification of Jamelle Jackson as the person in black.

{¶14} Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of

witnesses, and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*

{¶15} A reversal on weight of the evidence is ordered only in exceptional circumstances. *Id.* In fact, only a unanimous appellate court can reverse on the ground that the jury verdict was against the manifest weight of the evidence. *Id.* at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution. The review of the court of appeals is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the balancing of the import of the various pieces of evidence and the inferences that can be drawn therefrom.

{¶16} We defer to the jury who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E. 1273 (1994); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 1212 (1967). And thus, we proceed under the premise that when there are two conflicting versions of events, neither of which is unbelievable, it is generally not within our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). *See also State v. Moore*, 7th Dist. No. 12MA8, 2013-Ohio-1435, ¶ 155-156, 166. We now thoroughly review in detail the testimony presented in this case to determine whether the unanimous jury clearly lost its way and created a manifest miscarriage of justice.

{¶17} The female victim who was shot in the face testified that she saw appellant hit another male who swung back. (Tr. 1197). She saw fraternity members grab both males and take them out back. (Tr. 1174-1175). She went outside too cool off and saw the murder victim, Jamail Johnson, on the back porch trying to calm Jamelle Jackson, who had a silver semiautomatic handgun by his side. Jamelle was mad and was shaking his gun. (Tr. 1176, 1206). She went inside and told her friends they needed to leave, at which point she was shot. (Tr. 1178-1179). This victim's friend testified briefly that she saw Braylon Rogers and appellant at the party

but did not seen them fighting. (Tr. 1216, 1223). She saw individuals near appellant fighting and saw the fraternity members push them outside. (Tr. 1217-1218).

{¶18} The next to testify was a female who had been shot in the leg and arm. (Tr. 1252). She recognized Braylon Rogers as being involved in an altercation. (Tr. 1247). She stated that the three or four guys who were fighting got pushed outside as she exited. (Tr. 1246, 1256). In describing those who were pushed out, she reported that one was short with a hood, one had long dreadlocks, one had shorter braids or dreadlocks, and one had fades. (Tr. 1257, 1268). An argument then occurred outside, and she heard someone saying, "I just want him. I just want him." (Tr. 1249). She also heard the murder victim trying to mediate, asking the gunmen not to fight in front of the ladies, and encouraging bystanders back inside. (Tr. 1248-1249). She went back inside to collect her friends at which point the shooting started.

{¶19} A female victim, who was shot in the arm and in the side, testified that the first fight involved a heavy-set girl who was dancing into people. (Tr. 1311). She stated that the second fight resulted in people being escorted out. Soon thereafter, someone told her to move to the front of the house at which time the gunshots started. (Tr. 1285).

{¶20} Then, a female victim who was shot in the foot testified that she knew appellant, Braylon Rogers, Mark Jones, Demetrius Wright, and Jamelle Jackson and that she saw them all at the party. (Tr. 1322-1323). After the fight, she wanted to leave, but they were told not to leave out the back door. (Tr. 1329). She heard people arguing outside, and then she heard the gunshots. (Tr. 1330). She described two men to police as being involved in the fight: a guy with dreadlocks and a dark, thick, 5'8" man dressed all in black. (Tr. 1344).

{¶21} A female victim, who had been shot in the buttocks, testified that she could not tell who was involved in the fight because it was too dark. (Tr. 1357). Then, another female victim, who had been shot through the hip/pelvis, testified that she saw a crowd gather around a fight. When the music stopped, they were all instructed to leave. (Tr. 1383-1384). She saw people move toward the door, but

they soon started coming back into the room at which point the shots started. (Tr. 1384). She insisted that more than one gun was being fired. (Tr. 1391).

{¶22} The next to testify was a female who knew appellant and was a cousin to Braylon Rogers. She stated that a guy in dreadlocks approached Braylon Rogers and appellant and started punching. (Tr. 1416-1417, 1433). The fraternity members tried to break up the fight. She went to the back porch and saw the murder victim in the doorway. She also saw Victor Toney (who was wearing Green Bay Packers clothing). (Tr. 1419). A dark, thin, 5'8" man in all black, whom she had never seen before, was standing off the porch with his hand on a gun in his pocket. (Tr. 1420-1421). She watched appellant come out onto the porch wearing a white T-shirt with blood on him stating that he thought someone hit him with a bottle. (Tr. 1421-1422, 1432). She heard the murder victim say, "hold on; let's just talk about this." Someone responded, "Fuck talking; I'm done talking." (Tr. 1424, 1426). At this point, she walked around the side of the house to leave, passing someone whom she warned not to go back there. Shots began soon thereafter. (Tr. 1422).

{¶23} A male victim, who had been shot in the shoulder and in the foot, testified that he knew Braylon Rogers and appellant. (Tr. 1491). He saw them in a scuffle at the first party earlier in the night. (Tr. 1492). At the fraternity house party, he saw a heavy-set girl causing a scene and trying to poke Braylon Rogers in the face with a shoe, which prompted Braylon Rogers to push the girl. (Tr. 1497). He watched a male with dreadlocks pull the girl out of the party. (Tr. 1498-1499). She came back later with two men, and there was another scuffle wherein the two men fought five to six other men. The murder victim broke up the fight. A man in black (with some red) brandished a gun. (Tr. 1500, 1507). The murder victim said, "don't do this." (Tr. 1525). As this witness tried to get people to back up, two people started shooting. (Tr. 1502).

{¶24} Fraternity member Carl Davison testified that he broke up the fight involving a heavy-set female who hit someone with her heel. (Tr. 1539). When he heard that there were guys outside with guns, he walked to the back of the house. (Tr. 1541). (Presumably, he was the person who the female victim warned not to

walk around back.) Mr. Davison stopped a guy in a Green Bay shirt (Victor Toney) from trying to get back in the house. When this man told Mr. Davison that others were about to start shooting, Mr. Davison allowed him to enter and looked around to see two men standing off the back porch with guns.

{¶25} From the stand, he identified appellant Columbus Jones as one of the gunmen and said that he was wearing a black coat, dark jeans, and a skull cap. (Tr. 1542, 1585, 1587). He could not tell what color shirt appellant wore under his coat. (Tr. 1587). He thought he heard a gunman saying that he was not from here. (Tr. 1567). He briefly noticed two or three other guys off the porch with appellant as well, noticing red and white shirt colors and the presence of another gun. (Tr. 1544, 1546-1547).

{¶26} Mr. Davison testified that the murder victim was pleading with the gunmen. He also stated that his fellow fraternity member, Andre Miller, was restraining a guy (apparently Durrell Richardson) who wanted to fight the gunmen. He stated that he ducked as appellant Columbus Jones raised his gun at which point the murder victim tried to rush people back in the house and the shots started. (Tr. 1543).

{¶27} After the shooting, Mr. Davison did not pick out the photograph of appellant from the array. (Tr. 1577-1578). He stated that he recognized appellant as the shooter when he saw the news coverage of his arrest. (Tr. 1582). He explained that it was hard to identify appellant from the array as he had dreadlocks in that photo but did not have dreadlocks at the time of the shooting. (Tr. 1582). From another photo array, Mr. Davison chose a stranger to the event over the photograph of Braylon Rogers. He noted that he told police that Braylon Rogers was part of the altercation inside and was outside during the shooting but was not a shooter. (Tr. 1549, 1581).

{¶28} Testimony was then presented by a male who had been shot in the foot. He generally noticed a fight with a heavy-set girl and later a fight among unidentified males. (Tr. 1610-1611). He knew all of the people with appellant that night. He testified that Braylon Rogers was wearing all white that night. (Tr. 1604).

He stated that he heard one gun shooting and then another gun began shooting. (Tr. 1599, 1613). Another male, who was seventeen at the time of the incident, testified merely that he was shot in the toe from the back of the house after some people were fighting. (Tr. 1701).

{¶29} Fraternity member Andre Miller testified that prior to the shooting, he assisted a dazed male get up from the floor. This person had dreadlocks and a grill on his teeth, whom he now knows is Dannie Williams (the boxer from St. Louis). (Tr. 1630-1631, 1655, 1680). There were other males standing around Dannie Williams, and he was saying, "they thought I forgot, they don't know me, I'm not from here." (Tr. 1631). Andre Miller pushed Dannie Williams outside through the back door and right into a man in all black with a gun out. (Tr. 1631-1632). Andre testified that he and Dannie Williams jumped back from the gunman, who was tapping the gun against his hip in an angry manner and saying, "I just want him" while pointing at another boxer (whom he now knows as Durrell Richardson). (Tr. 1632-1633, 1636-1638, 1665). They saw the murder victim, Jamail Johnson, holding back Durrell Richardson who appeared to want to fight the gunman. Andre Miller warned Durrell that the person he was trying to fight had a gun. (Tr. 1633-1638).

{¶30} At trial, Andre Miller identified appellant Columbus Jones as the man with the gun, and expressed that he was 100% sure. (Tr. 1639, 1645, 1687). He said that appellant was wearing all black and that his jacket was like a Carhartt coat. (Tr. 1662). As was the case with Mr. Davison, Andre Miller did not identify appellant from the photographic array provided by police, and he picked out a stranger unrelated to the event in the array containing Braylon Rogers. (Tr. 1676, 1681). Mr. Miller recognized appellant as the gunman when he saw him on the news later that day, but he did not know that the person he picked out of the array was not the same person he recognized when he saw appellant on the news. (Tr. 1682, 1690). He pointed out that on the night of the shooting, appellant looked different than in his driver's license photograph used in the array as his hair had changed and he was skinnier in the face. (Tr. 1685).

**{¶31}** Marqueal Smith testified that he drove Braylon Rogers and appellant to the fraternity house. (Tr. 1713-1714). He stated that he went in the fraternity house after being patted down (which other witnesses testified was a regular occurrence at that fraternity's parties) and that he did not have a gun on him. (Tr. 1717). He stated that Braylon Rogers and appellant did not proceed straight into the party because they had guns on them. (Tr. 1717-1718). When they did enter, Braylon Rogers, whom he described as drunk, started a fight with a drunken heavy-set girl. (Tr. 1719). He stated that the girl's dreadlocked brother intervened, and Braylon Rogers hit him. (Tr. 1721). Braylon Rogers was said to have instigated the situation. (Tr. 1722, 1742).

**{¶32}** Marqueal Smith noticed the girl's brother leave and return with another man precipitating a more substantial fight. (Tr. 1721, 1742). Marqueal Smith testified that Braylon Rogers, appellant Columbus Jones, and Demetrius Wright were involved in this second fight. (Tr. 1721-1722). During the fight, Marqueal pulled someone off of appellant; he also said appellant was like a brother to him. (Tr. 1747, 1753). Chaos ensued, and he could not find his friends. While he was heading to the back door with other party-goers, gunfire erupted from that direction, requiring him to drop to the floor to take cover. (Tr. 1724-1725).

**{¶33}** After the shooting, he went to his car where appellant and Braylon Rogers were waiting with their guns still out. (Tr. 1727-1728). As they drove away, appellant voiced that he "aired it out." Appellant explained that he was bleeding from being hit in the head and that he did what he had to do. (Tr. 1731). Appellant indicated that Jamelle Jackson, who they were with that night but who was in a separate car, also participated in the shooting. (Tr. 1729). And, Braylon Rogers then claimed to have "aired it out" as well. (Tr. 1732). Marqueal Smith dropped off appellant and Braylon Rogers at Demetrius Wright's house on Laclede Avenue. (Tr. 1730).

**{¶34}** Dannie Williams, the person with dreadlocks and a grill on his teeth, then testified that he was a boxer from St. Louis. He was at the party with his sister and Victor Toney when his sister got into an argument with Braylon Rogers who kept

calling his sister a "bitch." They explained that she was drunk and that they were not from the area at which point Braylon Rogers swung on him. (Tr. 1765). Victor Toney then encouraged Dannie Williams to leave the party. They left and called another boxer, Durrell Richardson, who returned to the party with them and began speaking with Braylon Rogers, who was wearing a white hat. (Tr. 1765-1766, 1793). Dannie Williams testified that he swung on Braylon Rogers at which point someone tackled him and his sister hit that person in the head with her heel. (Tr. 1768, 1775).

{¶35} When they ended up on the back porch, a short black male wearing black said, "that was my boy you hit." Dannie Williams was about to hit the person in black when that person pulled a gun out prompting him to go back inside the house. (Tr. 1777). He picked out Jamelle Jackson as that particular gunman and testified that said gunman was not appellant. (Tr. 1773-1774, 1800).

{¶36} Durrell Richardson then testified. He knew appellant, Braylon Rogers, and Demetrius Wright prior to that night. He stated that when Dannie Williams and Victor Toney advised him of the incident at the party, he decided to accompany them back to the party to straighten things out. He approached Braylon Rogers with his hand extended, but Braylon smacked his hand down. He explained that he wanted to fix the situation, but Braylon declared that he was not there to talk. He said that appellant then flashed a gun by lifting his shirt. (Tr. 1821-1822). Durrell Richardson stated that thereafter, while he was at the back door, appellant and Braylon pulled guns out and the shooting started. (Tr. 1824). He identified them from a photo array as the two who pointed guns at him, and he spoke of a third individual with a red shirt. (Tr. 1832, 1834, 1856).

{¶37} The final eyewitness was Braylon Rogers. He testified that he had a 9mm handgun, appellant had a .40 caliber handgun, Jamelle Jackson had a .45 caliber gun, and Demetrius Wright had a .40 caliber handgun that night. (Tr. 1875). He stated that his gun was not found during the pat down at the fraternity because he had it by his crotch. (Tr. 1872). He testified that appellant's gun was found during the pat down and he was told to take it to the car, but instead, appellant had his gun passed back in through a window (although he did not see this occur). (Tr. 1873).

{¶38} Regarding the fights, he explained that a drunk girl leaned on him so he pushed her off and called her a bitch. When her "irate" brother approached, Braylon Rogers punched him in the face. (Tr. 1876). He said that the brother returned with other people including Durrell Richardson and started swinging at him and appellant. (Tr. 1876, 1879, 1941-1942). The fraternity members then pushed some people, including appellant, outside. (Tr. 1881). He stated that when they went to look for appellant outside where people were fighting, Durrell was saying that Demetrius was his cousin. (Tr. 1881-1882).

{¶39} According to Braylon Rogers, appellant said, "I'm about to air this out" and asked his brother, Mark Jones, for his gun back; appellant had his brother hold it while he danced. (Tr. 1883. 1931). Braylon Rogers testified that after appellant retrieved his gun, he started shooting toward the porch. (Tr. 1883-1885, 1972). He testified that Jamelle Jackson also started shooting toward the back door. (Tr. 1884). Braylon admitted that he had his .9mm gun out, but he denied firing any shots. (Tr. 1883-1884). Braylon stated that he was wearing mostly white and some blue, Jamelle was wearing black and red including a black coat, and appellant was wearing dark clothing. (Tr. 1896-1897, 1948-1949). On cross-examination, he said that he did not remember telling police that appellant and appellant's brother had on the same coat, one black and one dark blue, or that he had attributed the blue coat to appellant. (Tr. 1948).

{¶40} Braylon Rogers testified that he started running for the car during the shooting. (Tr. 1884, 1955). Marqueal Smith then dropped him and appellant off at Demetrius Wright's Laclede residence where appellant also lived. Demetrius Wright, Jamelle Jackson, and Mark Jones arrived soon thereafter. (Tr. 1886). Braylon Rogers testified that he told them he was shooting too as he "didn't wanna seem like a punk" and he cleaned his hands with ammonia along with appellant, Jamelle, and Mark. (Tr. 1887-1888). Demetrius then took the guns away somewhere. (Tr. 1889).

{¶41} Braylon Rogers and appellant were arrested later that day. Three days later, Braylon Rogers told his story to the police, which provided them with the name of Jamelle Jackson for the first time. Braylon also believed that the guns had been

moved to Demetrius Wright's grandmother's house on Delason Avenue. Five days after the shooting Braylon Rogers pled to a weapon under disability charge with the state agreeing to recommend probation. (Tr. 1910, 1917).

{¶42} Based upon his statement, the police executed search warrants on the Laclede and the Delason residences. At the Laclede residence, police seized a white T-shirt with blood on it from the trash, a black coat from the living room floor, and bottles of ammonia and household cleaner. At the Delason address, police found black pants, white socks, and blue underwear in a plastic bag in the outside trash can. They also found boxes of .40, .45, and 9mm ammunition in the trash. (Tr. 2015, 2018). The coat, bottle, pants, socks, and underwear were tested for gunshot residue, and these tests came back positive. (Tr. 2145-2146, 2150).

{¶43} Ten .40 caliber and eleven .45 caliber empty cartridges were recovered from the area next to the back porch where the shooters stood. (Tr. 2098). (Sixteen were discovered the night of the shooting, and six were recovered later with a metal detector after the snow melted.) It was determined that all of the .40 caliber cartridges were ejected from the one gun and all of the .45 caliber cartridges were ejected from another gun. (Tr. 2130). Two .40 caliber bullets were removed from the murder victim, and a .40 caliber was removed from a female victim who was shot in the face. (Tr. 2129-2130). The deputy coroner testified that the victim died of a gunshot wound to the back of the head and multiple gunshot wounds to the back of the leg. (Tr. 1456).

{¶44} Although there was much confusion and chaos during the fight, there is testimony connecting appellant to the shooting. As set forth above, Braylon Rogers testified that he saw appellant shoot multiple times into the back of the house, and he also saw Jamelle Jackson shoot. He said appellant had a .40 caliber handgun, and many .40 caliber cartridges and bullets were recovered. Although he may not seem to be a very credible witness and a rational jury could believe that he was a shooter and was lying about having only a .9mm, this was a decision for the jury to make. They saw his demeanor on the stand and could gauge his sincerity and credibility in person. They heard testimony that Braylon Rogers was instigating fights that night.

The jury also heard that Braylon Rogers had his gun out during the shooting. They heard that Braylon Rogers indicated to Marqueal Smith that he too fired shots, and they heard him explain that he lied about shooting to fit in with his friends. And, the jury heard that he received a favorable plea deal with the state dismissing the charges that were similar to appellant's charges. It was in the jury's province to determine that Rogers was lying on the stand. But, it was also within their province to choose to believe his story.

**{¶45}** Besides this testimony from Braylon Rogers, Marqueal Smith saw appellant with his gun still out after the shooting, and appellant essentially confessed the shooting to Marqueal, implicating Jamelle Jackson as well. That Jamelle Jackson was a gunman was confirmed by the female who was shot in the face and by Dannie Williams. This does not preclude appellant from being a shooter as it was established by various witnesses that there was more than one gun being fired. There was also much testimony about appellant being involved in the final fight. There was testimony that he was upset that his head was bleeding.

**{¶46}** Finally, Carl Davison, Andre Miller, and Durrell Richardson testified that appellant was one of the people pointing a gun toward the back of the house just prior to the shooting. (Tr. 1542, 1639, 1832). Although Mr. Davison and Mr. Miller had issues identifying appellant from the photographic array, these were explained by testimony that appellant had dreadlocks in his driver's license photograph but no longer had dreadlocks at the time of the shooting. The defense made much of the fact that Mr. Davison and Mr. Miller did not call the police after they recognized appellant on the news during his arrest to report that they identified the wrong person. However, Mr. Miller explained that he did not know he chose the wrong person, and the police confirmed that they do not tell the witnesses who they picked or whether they ended up being right or wrong. And, Durrell Richardson did pick appellant out of the array right after the shooting notwithstanding the hairstyle change.

**{¶47}** Considering all of this testimony and all of the evidence presented, some rational juror could conclude that appellant was one of the shooters.

Exceptional circumstances showing a manifest miscarriage of justice are not apparent. Accordingly, we refrain from sitting as a thirteenth juror and overriding the jury verdict. This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

**{¶48}** Appellant's second assignment of error provides:

**{¶49}** "THE TRIAL COURT ERRED IN SENTENCING APPELLANT JONES TO MULTIPLE PUNISHMENTS, IN VIOLATION OF R.C. 2945.25, FOR MURDER AND FELONIOUS ASSAULT, AND IMPROPERLY DISCHARGING A FIREARM AT OR INTO A HABITATION, WHICH ARE ALLIED OFFENSES FROM A SINGLE ACT WITH A SINGLE ANIMUS."

**{¶50}** Improper discharge is defined as, without privilege to do so, knowingly discharging a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual. R.C. 2923.161(A)(1), (D) (use definition of occupied structure in R.C. 2909.01); R.C. 2909.01(C)(1)-(4) (occupied structure does not require a person to be actually present). Appellant's sole argument presented under this assignment of error is that the improper discharge offense should have been merged with the other offenses all of which occurred because he fired into or at a habitation. (Appellant does not argue that the felonious assaults should merge with each other or with the murder.)

**{¶51}** Where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. R.C. 2941.25(A). Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the defendant may be convicted of all of them. R.C. 2941.25(B).

**{¶52}** Thus, there is a two-part test to determine if offenses should be merged. First, the elements of the two crimes are compared. *State v. Williams*, 134 Ohio St.3d 482, 983 N.E.2d 1245, 2012-Ohio-5699, ¶ 17, citing *State v. Blankenship*, 38 Ohio St.3d 116, 117, 526 N.E.2d 816 (1988). The elements of the two offenses

were previously considered only in the abstract but are now compared in the context of the defendant's conduct. *See id.* at ¶ 20; *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus, where a majority overruled *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999).

**{¶53}** We determine "whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other." *Johnson*, 128 Ohio St.3d 153 at ¶ 48 (Brown, J. plurality). *See also State v. Williams*, 7th Dist. No. 10MA136, 2012-Ohio-5344, ¶ 26 (applying this *Johnson* plurality). If the elements correspond to such a sufficient degree, then the crimes are allied offenses of similar import and the court must proceed to the second step. *See Williams*, 134 Ohio St.3d 482 at ¶ 17.

**{¶54}** "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' " *Johnson*, 128 Ohio St.3d 153 at ¶ 49. In this second step, the defendant's conduct is also reviewed, and only if the crimes were committed separately or there was a separate animus for each crime (or they are of dissimilar import under the first prong) can the defendant be sentenced for both. *See Williams*, 134 Ohio St.3d 482 at ¶ 17, 21-22.

**{¶55}** A court considering merger is to consider the entire record to determine whether the offenses were committed separately or with a separate animus. *See State v. Washington*, __ Ohio St.3d __, 2013-Ohio-4982, syllabus. This would include the evidence and arguments presented at trial and arguments and information presented at sentencing. *Id.* at ¶ 17, 19-20, 24 (and court is not limited by the state's theory at trial). The test is very dependent on the particular facts of each case, and the presence or absence of any specific factor is generally not dispositive. *Id.* at ¶ 16. The appellate court conducts a de novo review to determine whether the facts satisfy the applicable legal standard. *Williams*, 134 Ohio St.3d 482 at ¶ 25-28.

**{¶56}** In a case out of the Fifth District, the defendant was charged with felony murder and the predicate offense of discharging a firearm into a habitation

after he fired five shots into the front door, one of which killed the victim. *State v. Walton*, 5th Dist. No. 2011CA00214, 2012-Ohio-2597. The state did not dispute that the defendant's conduct met the first prong of the allied offense test. As to the second prong, the *Walton* court concluded that the two offenses were subject to merger, because they were "inextricably part of the same conduct." *Id.* at ¶ 56. That court noted that their conclusion "would not necessarily apply to every conceivable scenario of a killing from a drive-by shooting into a house." *Id.* As that was a predicate offense/felony murder case, it is distinguishable from the case at bar.

{¶57} Moreover, the First District has also distinguished *Walton* to conclude that a defendant was not entitled to merger of the improper discharge into a habitation offense with the three felonious assault offenses because the house was shot up so severely, noting that 28 shell casings were found at the scene. *State v. Whipple*, 1st Dist. No. C-110184, 2012-Ohio-2938, ¶ 40-42. That court found that Whipple had a separate animus, emphasizing that "the level of destruction unleashed by Whipple upon the home demonstrated that he sought to do more than commit felonious assault." *See id.* at ¶ 37-39

{¶58} The Fifth District then adopted the *Whipple* distinction of its own *Walton* case for situations when multiple bullets were fired at a household full of people. *State v. Kelly*, 5th Dist. No. 2012CA00067, 2012-Ohio-5875. The *Kelly* court concluded that the defendant's course of conduct indicated a distinct purpose to shoot up the residence. In *Kelly*, the defendant fired four to twelve rounds at a residence while ten people were on the front porch and others were inside. Only two people were shot. The Fifth District reasoned that this left two to ten rounds, any one of which would support the conviction for improper discharge of a firearm into a habitation. *Id.* at ¶ 26.

{¶59} The First District later decided a discharge offense would merge where the defendant fired several gunshots "in a quick manner" at a victim but also in the direction of an apartment building. *State v. Hodges*, 1st Dist. No. C-110630, 2013-Ohio-1195. First, the court discussed how the same conduct resulted in both offenses under the first prong of the allied offense test. *Id.* at ¶ 8-11, citing. Then,

the First District distinguished its *Whipple* case and concluded that the record did not show that Hodges had a motive to "shoot up" the building but rather showed that his motive was to shoot the individual. *Id.* at ¶ 17. Thus, the First District did not vary from its *Whipple* holding that a barrage of bullets can show a separate animus regarding the house. *See id.*

**{¶60}** The Sixth District has found that the charge of improper discharge of a firearm into a habitation (and another charge for improper discharge of a firearm from a motor vehicle) would merge into the three felonious assault convictions (one for each person in the house, none of whom were shot). *State v. Mitchell*, 6th Dist. No. E-09-064, 2011-Ohio-973, ¶ 40, 45. In merging the improper discharge offense, that court focused on the defendant's singular conduct, without expressly analyzing separate animus (except with regards to multiple victims). *Id.* at ¶ 40, 43, 44.

**{¶61}** We note that separate animus is a bar to merger that is distinct from whether the offenses were committed separately. *See Washington*, 2013-Ohio-4982, ¶ 12-13 (three disjunctive bars to merger: dissimilar import, committed separately, or separate animus); R.C. 2941.25(B). And, as discussed more below, *Mitchell* is distinguishable as it involved a charge per occupant of the house plus the improper discharge (whereas here the defendant was only charged for the people who were actually shot plus the improper discharge and other people were nearly shot).

**{¶62}** Hence, the courts that have addressed the scenario have not had issues with the first prong where the conduct involves a shot fired into a house that hits someone and the person is charged with the assault and the improper discharge. As, appellant urges, it is possible to commit improper discharge and with the same conduct as felonious assault or murder and vice versa. The same conduct of discharging the firearm at a habitation resulted in the commission of the crime of murder and felonious assault (and hitting each of those victims with a bullet required the act of discharging at or into the habitation under the circumstances of this case).

**{¶63}** Under the prior *Rance* test, the offenses would not have been allied under the first prong (as one could be committed without committing the other). But, under the *Johnson* test, which considers appellant's particular conduct and which

shows that one can be committed while committing the other, the offenses are allied under the first prong of the test. It the second prong where the argument lies.

**{¶64}** In applying the second prong, we must determine whether appellant committed the improper discharge into a habitation offense separately or possessed an animus for shooting at or into the house that was separate from the animus he possessed for the actual shooting of people. Appellant urges that improper discharge at or into a habitation was committed by the same conduct with the same animus as the felonious assaults and the murder offenses. The state suggests that any shots that did not hit a person support the separateness of the discharge offense.

**{¶65}** Animus means "purpose or, more properly, immediate motive" and can be inferred from the surrounding circumstances. *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). Under the particular facts of this case, we conclude that appellant had more than one animus during the shooting, and thus, the improper discharge at or into a habitation need not be merged.

**{¶66}** The shooting caused one death, and at least ten other people were injured by bullets. A minimum of twenty-one bullets were fired during the shooting.[1] Thus, we have many bullets and we have many victims, some of whom were shot more than once. There are indications of more bullets than victims of charged offenses. Although we do not adopt a victim-to-bullet ratio as the test, it is a consideration. Another consideration is that the shooters were moving as they shot since the casings appeared in the form of trails.

**{¶67}** This was a heavily-populated house that suffered a barrage of bullets in the midst of a party and then a stampede-like atmosphere. Appellant knew the population of the house as he had just been inside dancing among the crowd (which was said to number more than 50). Many individuals had to take cover, and many were nearly shot (including appellant's own driver).

---

[1]Some shells were not discovered until after the snow melted and metal detectors were used, Testimony was presented on the mass exodus from the house after the shooting, emphasizing the trampling of evidence. Some shells may thus remain undetected.

{¶68} In addition, the original boxer, his sister, and his friend were the main participants opposing appellant's group of friends in the altercation precipitating the shooting and in a prior altercation. Considering all of the facts including all reasonable inference to be drawn therefrom, these three would have been a principal aspect of appellant's motive. However, these three did not end up being shot during the event (and no separate charges were brought for them or the other people who were not shot).

{¶69} In the portions of the record cited by the dissent, the state's focus was on appellant's intent to harm as many people as he could. The state was underscoring that this was not a case where a defendant shoots into the air and accidentally kills someone. The state explained the improper discharge offense in opening and mentioned shooting into the house in closing but did not again focus on the discharge offense because its commission was indisputable once one concluded that appellant was one of the shooters. As the Ohio Supreme Court recently clarified, the state has no obligation to make specific distinctions at trial with regard to later merger issues; rather, the burden is on the defendant to establish his entitlement to merger. *Washington*, 2013-Ohio-4982, ¶ 17-18.

{¶70} Moreover, merely because the state did not specifically outline its response to every particular merger request at sentencing does not entitle the defendant to merger. *See id.* (the state's theory is just one consideration; the court must review the entire record). If, for instance, a prosecutor responds to a defendant's merger argument by stating that they leave the matter to the court, this does not mean the defendant is entitled to merger.

{¶71} According to the state's theory, more people would have died and/or been shot but for the fact that appellant's position happened to be slightly below the elevation of the house. The state emphasized the crowd of people into which the shooters purposely fired. Notably, the defense suggested at sentencing that the only objective was to shoot at one person, either the murder victim or Durrell Richardson. As the state pointed out in closing, the shooters kept firing into the house even after the murder victim was down. The state also pointed out that semi-automatic

weapons (as used by the shooters here) require the trigger to be engaged multiple times, as opposed to a fully automatic weapon such as a machine gun.

**{¶72}** Finally, appellant had just been in a fight with many individuals, he was upset that his head was bleeding, and his group was being ejected from the party. It can be surmised that he did not merely wish to shoot people for revenge or out of anger but he also wished to shoot up a house in order to ruin an event and scare every person there. Notably, appellant announced prior to the shooting that he was "about to air this out" and his driver confirmed that appellant thereafter stated that he "aired it out." This statement from appellant himself further evidences appellant's separate motive to break up the party by shooting into the house, e.g. a mentality of "if I have to leave the party, then so does everyone else."

**{¶73}** Under the unique facts of this case, there is evidence that appellant had, for instance, a specific intent to shoot some particular individuals who were on the porch or heading into the house, a general intent to harm some other random partygoers, *and* also a desire to wreak havoc on the entire house and its many occupants. These are distinct motives. This ruling is consistent with the First District's *Whipple* case and the Fifth District's *Kelly* case (a more recent holding than its *Walton* case). The facts of this case present just as strong a case for non-merger as the facts existing in those cases. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER THREE

**{¶74}** Appellant's third assignment of error provides:

**{¶75}** "APPELLANT JONES WAS DENIED THE RIGHT TO DUE PROCESS AS GUARANTEED [BY THE CONSTITUTION] WHEN CUMULATIVE, GRUESOME, AND PREJUDICIAL PHOTOGRAPHS WERE ADMITTED OVER OBJECTION AND CONTRARY TO EVID.R. 403, DESPITE THE PHOTOGRAPHS' SUBSTANTIALLY MORE PREJUDICIAL THAN PROBATIVE CONTENT."

**{¶76}** Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. Evid.R. 403(A). Relevant evidence *may be* excluded if its probative value

is substantially outweighed by the consideration of the needless presentation of cumulative evidence. Evid.R. 403(B).

{¶77} Thus, in a noncapital case,[2] such as the one before us, the admission of potentially prejudicial photographs is determined under a discretionary balancing test that requires exclusion only if the probative value of the photographs is substantially outweighed by the danger of unfair prejudice. *State v. Franklin*, 62 Ohio St.3d 118, 125, 580 N.E.2d 1 (1991). *See also State v. Slagle*, 65 Ohio St.3d 597, 601, 605 N.E.2d 916 (1992) (application of Evid.R. 403 in relation to the admissibility of photographs is left to the sound discretion of the trial court). The mere fact that a photograph may have gruesome aspects does not render it inadmissible per se. *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

{¶78} The coroner testified that photographs are taken when the body arrives and then again after the body is cleaned to show the details of the wounds. Defense counsel asked to approach, and an off-the-record discussion was held. The case then came back on the record out of the jury's hearing. (Tr. 1457). The court stated that the defense was objecting to some of the graphic photographs that the state intended to display. (Tr. 1457-1458). Defense counsel then voiced that some photographs were prejudicial and some were duplicative. The court stated that the prosecutor indicated that all duplicative photographs have been removed. (Tr. 1458). The court concluded that graphic does not necessarily amount to overly prejudicial and overruled the objections. (Tr. 1458-1459).

{¶79} The state then began displaying photographs. Defense counsel thereafter added that he wished the record to reflect that the photos were being shown on a projector screen, which had been part of his challenge, and the court allowed the record to reflect this challenge. (Tr. 1462). After the state rested, the defense renewed the objections to the autopsy photographs "that we already

---

[2]In capital cases, the Supreme Court is more concerned with repetitious photographs, notwithstanding, Evid.R. 403(B)'s optional "may be excluded" language. *Id.* Even in a capital case, the admission of photographs that are fairly repetitious and are merely shot from different angles is not reversible unless the defendant was prejudiced. *State v. Davis*, 62 Ohio St.3d 326, 348, 581 N.E.2d 1362 (1991).

discussed at sidebar by number".  The court stated, "for the record, we did already go through specifically the objections to the autopsy photos, it was covered by another court reporter, they were identified by number at that point in time.  So the objections would apply at this point in time to those numbers and the same ruling, of course, since they have already been published."  (Tr. 2243).

**{¶80}** However, the transcript before us does not contain specific objections by number.  (Tr. 1457-1458).  As aforementioned, after the off-the-record sidebar, recorded objections occurred on the record with no mention of particular photographs or argument as to each.  Still, we proceed with our analysis.

**{¶81}** On appeal, appellant takes issues with four photographs:  Exhibits 17, 23, 28, and 29.  He states that they are repetitive and unnecessarily graphic (made more so by the state's use of the color projector).  He also believes that the photographs are not illustrative of the deputy coroner's testimony.

**{¶82}** Exhibit 17 is close-up of the victim's face before the coroner cleaned him.  Appellant believes it is repetitive because Exhibit 18 was already submitted showing the victim's face after it was cleaned of blood and because the victim's picture in life was submitted as Exhibit 1.  He believes Exhibit 17 is gruesome because the victim's face has blood smeared and dried in some places; we also note that the victim's eyes are slightly open.  No wounds were said to be depicted as none occurred to the front of the head.  Thus, it was not illustrative of the wounds themselves.

**{¶83}** Yet, the coroner did testify that when the victim was presented for autopsy, a tongue blade was in his mouth, showing that medical intervention had been attempted.  (Tr. 1454).  Exhibit 17 showed that the victim's condition when he entered included that medical device.  This may have been mentioned because some partygoers apparently complained about the perceived lack of attention to the murder victim during the emergency response (while police ensured the scene was free of shooters).  The photograph is illustrative of the coroner's testimony regarding the tongue blade, the photograph is not shocking or inflammatory as murder cases go, and prejudice is not apparent.

**{¶84}** Exhibit 23 is a photograph of the inside of the victim's leg from upper thigh to mid-calf, showing a clean bullet wound in the upper thigh and a clean bullet wound in the calf. The depiction of a bullet wound is not necessarily particularly gruesome. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 149. The photograph here is not particularly gruesome, is not inflammatory, and it is highly illustrative of the testimony on the wounds suffered. *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 94 ("Although gruesome, each of these photographs supported the medical examiner's testimony and provided an overall perspective of her wounds.").

**{¶85}** Evidence showing the entrance and exit wounds is permissible. *See, e.g., State v. Moore*, 81 Ohio St.3d 22, 32, 689 N.E.2d 1 (1998) (photographs illustrating the type of wounds suffered by the victim and those corroborating the testimony of the coroner have significant probative weight that can overcome potential prejudice); *Maurer*, 15 Ohio St.3d at 265 (the number of shots fired, the place where the bullet entered and exited the body and the resulting wounds are all probative of purpose to cause death). Just because the defendant ends up contesting that he was the shooter rather than whether the shooter had purpose or cause of death does not mean that the state should not prove these items.

**{¶86}** Appellant also believes Exhibit 23 is repetitive of Exhibits 21 and 22. However, it is not repetitive of Exhibit 22 because it shows the *entrance* wound on the *outer* calf, whereas Exhibit 23 shows the *exit* wound on the *inner* calf. Exhibit 21 does show the exit wound to the inner calf again, but it is also used to illustrate the testimony that the bones of the lower leg were broken by the impact of the bullet. (Tr. 1464). Moreover, where photographs of the same area of the body that are merely shot from different angles are unnecessarily repetitious, they do not establish reversible prejudice. *State v. Green*, 7th Dist. No. 01CA54, 2003-Ohio-5542, ¶ 4 (application for reopening denied), citing *State v. Davis*, 62 Ohio St.3d 326, 581 N.E.2d 1362 (1991). Finally, as Exhibit 23 was not gruesome, there is no prejudice.

**{¶87}** Exhibit 28 is a photograph of the inside of the skull after the brain had been removed. (Tr. 1473). This photograph is gruesome due to the gleaming dura

(lining of the skull), some puddles of blood on the dura, and the presence of what appears to be a dark red gelatinous matter in a portion of the background. The deputy coroner stated that this photograph illustrated the clues he found to ascertain that the hole depicted was an entrance wound. He then explained those clues including fractures and the flaring out of the bones or beveling. (Tr. 1474). Thus, although gruesome, it was illustrative of the testimony establishing the entrance wound to the back of the head.

**{¶88}** And, this exhibit was not unduly repetitive of Exhibit 29, which is the final photograph raised as objectionable on appeal. Exhibit 29 is a photograph of the entire brain sitting on a table with long tweezers being held through the bullet's path. The coroner's placement of instruments through body parts to show trajectory is a regular and necessary practice for his own study. *State v. Clay*, 7th Dist. No. 08MA2, 2009-Ohio-1204, ¶ 62. We have stated, in a case where the probe made it look like the victim had an arrow through his neck, that the path "could be established to the jury in a less dreadful manner." *Id.* We continued, however, that the mere fact the photograph had gruesome aspects did not render it inadmissible and concluded that prejudice to the defense had not been established as a result of the jury viewing how the coroner determined the projectile's path. *Id.*

**{¶89}** During the display of this photograph, the state asked about trajectory, and the coroner answered that the photograph would only determine trajectory in a loose way and stated that this was not the point he was trying to make. (Tr. 1475). Thus, appellant thinks the photograph was not illustrative of the testimony. However, the coroner had just stated that the photograph showed the bullet's path in the brain from the back, up, and out the right/top/side area. (Tr. 1475). Thus, even if it was not what *he* used to make his own determination of trajectory; it did illustrate the path in some manner. Moreover, the coroner also explained that the point he was trying to make was to show that the tissue was damaged and that the bullet did not just cut across the surface but went through the brain, which established the placement of the wound and cause of death. (Tr. 1476).

**{¶90}** Jurors would probably rather not see the tissue and blood on and around the inside of the skull as they examine the evidence supporting the conclusion that a wound is the entry point, and jurors would likely rather see bullet holes than view an entire bloody brain sitting on a table. It seems the state should avoid the use of autopsy photos of bare tissue and organs existing only because of the coroner's surgical procedures where other photographs of entry and exit could have sufficed or a closer shot of the inside of the skull could have been made to avoid the background shine and gore, especially where the photos are to be projected and presumably enlarged for the jury.

**{¶91}** However, the existence of more respectful alternatives does not make the case reversible. And, enlarged size or projection does not render photographs inadmissible. *See State v. Biros*, 78 Ohio St.3d 426, 444, 678 N.E.2d 891 (1997) (gruesome slides used to illustrate coroner's testimony; size does not automatically increase prejudice); *State v. Gumm*, 73 Ohio St.3d 413, 425, 653 N.E.2d 253 (1995). In fact, in some cases, it is difficult for a coroner to utilize photographs and effectively display them to the jury at the same time without some type of enlargement. *State v. DePew*, 38 Ohio St.3d 275, 282, 528 N.E.2d 542, (1988).

**{¶92}** In conclusion, the mere fact that a photograph may have gruesome aspects or appears horrendous does not render it inadmissible per se. *Maurer*, 15 Ohio St.3d at 265. The admission of these potentially prejudicial photographs was subject to the trial court's use of a balancing test requiring exclusion only if the probative value of the photographs was *substantially* outweighed by the danger of unfair prejudice. *Franklin*, 62 Ohio St.3d at 125; Evid.R. 403(A). And again, the place where the bullet entered and exited the body and the resulting wounds have significant probative value. See *Maurer*, 15 Ohio St.3d at 265. *See also Moore*, 81 Ohio St.3d at 32; *Allen*, 73 Ohio St.3d at 636.

**{¶93}** Although some judges would have excluded the photograph of the brain and maybe even the photograph of the inside of the skull as they were graphic and were the creation of the coroner's autopsy, a reasonable trial court could find that the probative value of these photographs was not *substantially* outweighed by

the danger of unfair prejudice. *See* Evid.R. 403(A). *See also State v. Clark*, 2d Dist. No., 20749, 2005-Ohio-6831, ¶ 44 (photograph of brain after removed from skull was admissible as it was offered to show the hemorrhaging of the brain that occurred as a result of the gunshot wound to the head and how that related to the path of the bullet; "While gruesome, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice."). The admission of the photographs contested here was within the trial court's sound discretion under Evid.R. 403(A). This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

**{¶94}** Appellant's fourth and final assignment of error provides:

**{¶95}** "THE TRIAL COURT ERRED WHEN IT ADMITTED GUNSHOT RESIDUE-TESTED CLOTHING INTO EVIDENCE AT TRIAL THAT WAS SUBSTANTIALLY MORE PREJUDICIAL THAN PROBATIVE, CONTRARY TO EVID.R. 403(A), BECAUSE THE GUNSHOT RESIDUE-TESTED CLOTHING WAS NOT ESTABLISHED TO BE IN THE EXCLUSIVE CONTROL OR POSSESSION OF APPELLANT JONES."

**{¶96}** Evid.R. 403(A) provides that relevant evidence must be excluded if the danger of unfair prejudice substantially outweighs the probative value of the evidence. The admission or exclusion of relevant evidence lies within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Failure to object at trial waives all but plain error, meaning that the error is not reversible unless the outcome of trial clearly would have been otherwise. *State v. Hill*, 73 Ohio St.3d 433, 438, 653 N.E.2d 271 (1995).

**{¶97}** As no objection was entered at trial, appellant contends that it was plain error to allow the introduction of a black winter coat, black pants, a pair of underwear, a pair of socks that tested positive for gunshot residue.[3] The black coat was found on the living room floor at the Laclede residence. All other items introduced here

---

[3]Appellant also references a dark shirt here; however, the gunshot residue analyst did not testify about this shirt. (Tr. 2143-2147).

were found in a plastic bag in a trash can at the Delason residence (along with boxes of ammunition).

**{¶98}** Appellant complains that there was insufficient or incredible testimony connecting him to the places where the items were found. As there was testimony connecting appellant to the shooting, there was also testimony connecting him to residences. That is, some of the ammunition in the Delason trash matched the .40 caliber bullets used to shoot the murder victim. The fact that clothes were thrown away with such ammunition the day of the murder is suggestive that the clothes were used in the shooting. It is not as if the clothes were found folded in a bedroom dresser drawer where ammunition was stored. And, there was testimony that appellant was wearing a black winter jacket and dark pants during the shooting. (Jamelle Jackson was also said to be wearing dark clothing, and a black jacket was taken from his person, which tested positive as well. {Tr. 2146, 2150}).

**{¶99}** It should also be noted that, although appellant's brief cites Tr. 2236-2237 in support of an argument that appellant denied living at Laclede to police, these pages do not contain such testimony. Marqueal Smith testified that Demetrius Wright lived at Laclede and that he had not seen appellant there before that night. However, he did drop appellant off at the Laclede residence after the shooting. (Tr. 1730). A white tank top[4] with blood on it was found at the Laclede residence as well, and appellant was said to be wearing a white shirt and bleeding, further connecting items at Laclede to appellant.

**{¶100}** Furthermore, Braylon Rogers testified that appellant lived at the Laclede residence with Demetrius Wright. (Tr. 1886). He also testified that they met there after the shooting where the guns were then hidden by Demetrius Wright who

---

[4]As for the white shirt versus black coat issue, this is a weight of the evidence. Multiple witnesses put appellant in a black coat as he stood outside with a gun, and a witness put him in a white shirt with blood as he exited the house. It was noted by a witness that the color of the shirt appellant wore under his coat could not be seen at the time of the shooting. One could conclude that a person would not wear a heavy coat inside a crowded party while dancing, which is where appellant was when he got hit in the head, but would put the coat on over his tank top when he went outside in the snow.

was said to have moved them to Delason the next day. The credibility of his testimony establishing this connection was a jury question.

{¶101} This provides substantial evidence connecting appellant to the location where the black jacket was discovered. Contrary to the suggestion in the brief, the evidence need not be established to have been in appellant's exclusive possession in order to pass the Evid.R. 403(A) test. The probative value of the evidence was not substantially outweighed by the danger unfair prejudice.

{¶102} Appellant also complains that the items (other than the coat) were likely cross-contaminated as they were found in the same bag with ammunition. This possibility does not mean that they were not clothes used by one of the shooters. Notably, the contamination mentioned is not that involving the crime scene investigators or the lab, but the contamination which may have been caused by the actions of appellant's friends in helping to dispose of evidence after the shooting.

{¶103} In fact, counsel presented questions related to the cross-contamination theory. (Tr. 2150-2157). Thus, the jury heard that when something with gunshot residue is thrown into a bag with clothes, there can be transfer. (Tr. 2156-2157). This issue goes toward weight, not admissibility, which is why defense counsel did not object to the admission of the clothing here. There is no error here, let alone plain error, and this assignment of error is overruled.

{¶104} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Waite, J., concurs.
DeGenaro, P.J., dissents; see dissenting Opinion.


DeGenaro, P.J., dissents.

Given the merger analysis announced in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, and clarified in the recent Ohio Supreme Court decision in *State v. Washington,* Slip Opinion No. 2013-Ohio-4982 (Nov. 14, 2013), we must now consider not only the evidence of the defendant's conduct, but

the arguments presented at trial and the arguments presented at sentencing as well. Applying this merger analysis, the shooting here was a single transaction with the same animus, thus, Appellant's conviction for improper discharge of a firearm into a habitation should merge into his other convictions for sentencing.

The essence of the principle of merger is to strike a balance between enabling the state to have the necessary flexibility to prosecute crime without compromising constitutional principles. The Ohio Supreme Court in *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, articulated how to strike this balance without violating the Double Jeopardy Clause as follows:

A defendant may be indicted and tried for allied offenses of similar import, but may be sentenced on only one of the allied offenses. Id., citing *Geiger,* 45 Ohio St.2d at 244, 74 O.O.2d 380, 344 N.E.2d 133.

* * *

In cases in which the imposition of multiple punishments is at issue, R.C. 2941.25(A)'s mandate that a defendant may be "convicted" of only one allied offense is a protection against multiple sentences rather than multiple convictions. See, e.g., *Ohio v. Johnson* (1984), 467 U.S. 493, 498, 104 S.Ct. 2536, 81 L.Ed.2d 425, in which the United States Supreme Court held that the Double Jeopardy Clause protects against successive prosecutions and against *multiple punishments* for the same offense. Thus, to ensure that there are not improper cumulative punishments for allied offenses, courts must be cognizant that R.C. 2941.25(A) requires that "the trial court effects the merger at sentencing." *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 135. See also *State v. Palmer* (1997), 80 Ohio St.3d 543, 572, 687 N.E.2d 685; *Stewart,* 2006-Ohio-3310, 2006 WL 1781412, ¶ 6.

* * *

The General Assembly has made clear that it is the state that chooses which of the allied offenses to pursue at sentencing, and it may choose any of the allied offenses. *Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 16 and 43, citing *Geiger,* 45 Ohio St.2d at 244, 74 O.O.2d 380, 344 N.E.2d 133; Legislative Service Commission Summary of Am.Sub.H.B. 511, The New Ohio Criminal Code (June 1973) 69. In conferring that right on the state, the legislature did not specify when the state must make that election. The Legislative Service summary states that "the prosecution *sooner or later* must elect as to which offense it wishes to pursue" (emphasis added), id., thereby implying that the state has latitude in determining when to decide which offense to pursue at sentencing.

In light of the legislative history, we concluded previously that the statute does not require the state to make its election prior to trial. *State v. Weind* (1977), 50 Ohio St.2d 224, 236, 4 O.O.3d 413, 364 N.E.2d 224, vacated on other **188 grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. See also *State v. Roberts* (June 23, 1988), Auglaize App. No. 2–87–18, 1988 WL 68700 (the state does not lose its right to elect by failing to exercise it before a verdict of guilty has been returned).

*Id.* at ¶17-21.

As demonstrated by the facts set forth in the Majority, the shooting here was a single transaction. As noted by the trial court at sentencing, the shooting escalated from a fight earlier in the evening. A review of all the witnesses' testimony demonstrates that once the shooting started, it did not stop. Tempers were still flaring from the earlier incident, and the shooting was a deadly continuation of the altercation between Dannie Williams, Victor Toney and Durrell Richardson on one side, and Braylon Rogers, Demetrius Wright and Appellant. Majority, ¶31-39. This wasn't a situation where, for example, Appellant retreated, returned and commenced

another round of firing into the home. Had that been the case, there would have been a separate animus sufficient to preclude merger, just as there was to preclude merging the murder and ten felonious assault convictions.

I disagree with the Majority with respect to *State v. Walton*, 5th Dist. No. 2011 CA 00214, 2012-Ohio-2597, because it distinguishes *Walton* as "a predicate offense/felony murder case," Majority, ¶55, using analysis which considers the offense in the abstract, and stricken from the merger analysis by *Johnson* and *Washington.* Looking to the facts and arguments in both this case and *Walton,* merger is warranted.

In *Walton* "several bullets flew through the living room" with one striking and killing the victim. *Id.* ¶2. Here, "More than twenty bullets from two different guns were then fired toward the house" which resulted in one death and multiple victims suffering gunshot wounds. Majority, ¶6. In *Walton* the Fifth District concluded that the convictions should merge because '[t]he count of murder was expressly based on the theory that Singleton's death was the proximate result of Appellant's underlying unlawful act of firing a gun into a habitation." *Id.* ¶56. Here, the State's theory at sentencing, which is key in light of *Washington,* is that the murder and felonious assault convictions were not the result of Jones firing *at* the residence; the offenses were a result of Jones firing *into* the residence at particular people. This is borne out by the evidence at trial; the motive of this single transaction was an escalation of the fight and to shoot and kill or hurt people. Thus, as in *Walton,* the improper discharge conviction should merge for sentencing.

In *State v. Mitchell*, 6th Dist. No. E-09-064, 2011-Ohio-973, the Sixth District stated with respect to merging both the discharging a firearm into a residence conviction and the conviction for improperly handling a firearm in a vehicle with the other related convictions the Sixth District reasoned:

> Appellant argues that the three counts of assault should merge into the discharging a firearm into a residence offense. We agree that it is possible to commit assault while firing into a residence, and that, in

> the present case, appellant's singular conduct resulted in the commission of both crimes. However, while we think that the *Johnson* test calls for merging Count 2 with the assault, we cannot say that the three assault charges should merge.
>
> * * *
>
> Lastly, appellant argues that Count 5, complicity to improperly handling firearms in a motor vehicle, should also merge. On this count, we concur. In light of *Johnson,* it is possible to commit both the assaults and the discharging a firearm into a habitation offense while committing this offense. Likewise, the record shows that it was the same conduct that led to his conviction on this charge and the others. Accordingly, this offense should merge into the assault convictions.

*Mitchell*, ¶40, 44.

Again, the factual circumstances here are akin to those in *Mitchell* and warrant merger of the discharge into a habitation offense. Discharging a firearm into a residence from a vehicle was a single transaction which resulted in the assault convictions in *Mitchell;* this leads to the logical conclusion that it additionally involved a single animus. Regarding the assault convictions in *Mitchell*, although they arose from the same transaction as the two weapons convictions, they have a separate animus because there were three separate victims. Generally, regardless of how many victims there are, a weapon can only be fired by a single defendant from one vehicle into one house, and neither a vehicle nor a residence can be victims. Similarly in this case, Appellant shooting into the fraternity house killing one victim and wounding 10 others was a single transaction and involved a single animus *only as to firing into the habitation.* The convictions for murder and felonious assault, by contrast, are offenses committed within this single transaction and have a separate animus because they involve separate victims which precludes merger.

Reviewing decisions from our sister districts for guidance is instructive, but they are just that, a source of analytical guidance. What is controlling is our correct

application of *Johnson* and *Washington* to the record before us when considering whether Appellant's improper discharge conviction should merge into his other convictions for sentencing.

The syllabus in *Washington* provides:

When deciding whether to merge multiple offenses at sentencing pursuant to R.C. 2941.25, a court must review the entire record, including arguments and information presented at the sentencing hearing, to determine whether the offenses were committed separately or with a separate animus.

The Court elaborated:

Nothing in Ohio's felony-sentencing statutes prohibits the litigation of merger at sentencing. To the contrary, R.C. 2929.19(B)(1) states that the trial court "shall consider * * * *any* information presented" by the defense or the prosecution at the sentencing hearing. (Emphasis added.) Further, R.C. 2929.19(A) allows the state and the defendant to "present information relevant to the imposition of sentence in the case." On appeal from a felony sentence, the reviewing court "shall review the record," R.C. 2953.08(G)(2), which includes more than the evidence and arguments presented at trial. R.C. 2953.08(F)(3) provides that the record to be reviewed shall include "[a]ny oral or written statements made to or by the court at the sentencing hearing." *See also* App.R. 9(A) (defining what constitutes the "record on appeal in all cases").

*Id.*, ¶20.

Turning to the particulars of this case, a review of all the witnesses' testimony demonstrates that once the shooting started, it did not stop. "More than twenty bullets from two different guns were then fired toward the house" which resulted in one death and multiple victims suffering gunshot wounds. Majority, ¶6. During

opening statements, the State presented the facts and the offenses of felonious assault and improper discharge in such a fashion as to be construed as one continuous course of conduct by Jones:

> "We have 11 victims who were actually shot. Now, mind you, there were a lot of other people in this house. Fortunately not all of them were injured or killed as a result of this * * *.
>
> Shooting at or into a habitation. There is one count that just pertains to shooting into a dwelling. This was a fraternity house. Kids lived there. Obviously people were present. That count is a separate count, but what it means is I shot into an occupied structure. People live there. People were there.
>
> * * *
>
> "They didn't just spray the house with bullets. They fired in that door."

(Trial Tr., pp. 1059-60, 1074).

In its closing statement, the State, consistent with the testimony at trial, argued its theory of the case that this was a single transaction and that there was no separate animus for the firing into a habitation offense:

> If I take a gun and I point it at a house full of people and shoot through the door, into a crowd of people, when people are on the porch, in the house, you can infer from that, I'm using a deadly weapon, that my purpose is to severely injure somebody and cause their death.
>
> * * *
>
> Now, felonious assault is causing or attempting to cause physical harm by means of a deadly weapon. And again, those guns were pointed, and you heard the evidence, they didn't shoot around the door, *they didn't shoot even* [sic] *up the house, they shot through the door. And once Jamail Johnson went down, they kept shooting.*

When I talk about purpose, and the felonious assaults, and knowing that your conduct will cause a certain result, you heard Mike Roberts from BCI talk about the distinction between an automatic, fully automatic weapon, versus a semi-automatic. Fully automatic, you pull the trigger and it just keeps shooting. A semi-automatic, you have to keep pulling that trigger. You have to pull it once, twice, three times, four times, five times, six times, seven times, all the way up to the number of shots that went into that house.

* * *

When those two engaged *in the common design to shoot up that house,* they are both responsible for the result that occurred.

* * *

Once you take all of that information together, * * * you're going to find that Columbus Jones shot into that house with a .40 caliber firearm, a Glock, and killed Jamail Johnson and he caused injury to all of those other kids.

(Trial Tr., pp. 2262-4, 2283)

Finally, at the sentencing hearing, the State made no argument at all regarding the improper discharge conviction during its closing argument:

And I think one of the things I would ask you to consider is the intent of Columbus Jones during this incident. This wasn't shooting a gun in the air and happened to hit someone. This was literally, the evidence has shown, shooting through that doorway, shooting at people. You know, we hear about drive-by shootings and houses are shot up. He didn't do that. He shot into that house. He shot directly at these people. That was his purpose. His purpose was to kill. His purpose was to hurt.

(Sent. Tr., pp. 20-1)

The State then made an argument regarding the gun specifications. Defense counsel made his argument regarding merger, discussing first the law articulated in *Johnson*, and then applying it to Jones' convictions, arguing: "To start with, the improper discharge into a habitation clearly is an allied offense, allied with the murders or the felonious assault, it's the same act. Those sentences cannot, by law, be run consecutive." (Sent. Tr., pp. 27-8). The State offered nothing in rebuttal and the trial court declined to merge that offense without discussion.

I disagree with the Majority's interpretation of the holding in *Washington* and how it applied the rationale to the state's arguments in light of the evidence, particularly at sentencing. Majority at ¶69-71. I do not suggest that the state was bound by or had to make particular distinctions *at trial* in order to make any argument *at sentencing* in opposition to merger. Whether the state's theory of the case discussed at opening would be available to be made at closing is wholly dependent upon what the evidence *actually* was at trial, not how it was *anticipated* the evidence would be.

During trial, the state uses the evidence during trial as a sword to obtain a conviction on as many of the indicted counts as possible, even if they are allied offenses that will eventually merge at sentencing, for example, the two murder convictions here. Conversely, at sentencing the state uses arguments based upon the evidence as a shield to protect as many of the multiple convictions from merger. Because of the constitutional prohibition against double jeopardy, regardless of the arguments the state makes at sentencing, as a matter of law, if the state used the same evidence to support multiple convictions, the offenses must merge, in the absence of separate animus where, as here, the convictions arose from a single transaction.

The Supreme Court's statement in *Washington* at ¶18 and the Majority's at ¶69 raises double jeopardy and due process concerns, as both state that the burden is on the defendant to prove merger. Merger is a question of law. Significantly, even if neither the state nor the defendant nor the trial court address merger, the error can be raised on appeal as plain error, in order to vindicate due process and double

jeopardy protections. "Because an error related to merger affects a defendant's right to protection from double jeopardy, and because an erroneous failure to merge convictions inevitably causes a different outcome in a defendant's trial, the failure to merge convictions on allied offenses of similar import will almost always result in plain error." *State v. Haslam,* 7th Dist. No. 08–MO–3, 2009–Ohio1663, at ¶ 62; see also *State v. Stoffer*, 7th Dist. No. 09-CO-1, 2011-Ohio-5133, at ¶ 172.

Pursuant to the merger analysis set forth in *Washington*, a review of the complete record, specifically the evidence and arguments at trial, as well as the arguments made at sentencing, Appellant's conviction for improper discharge of a firearm into a habitation should merge into his other convictions. During the state's opening statement, it discussed briefly the improper discharge offense, and devoted the remainder to the murder and felonious assault offenses. However, in light of the evidence adduced at trial, the state abandoned the improper discharge offense at closing and at sentencing; focusing on the other offenses. Jones' conduct was part of a single transaction, and there is not a separate animus for this sentence. Consequently, merger is warranted.